## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICIA L. PINNEY,
**10497 West Drive**
**Fairfax, Virginia 22030,**

     **Plaintiff,**

       **v.**

**JAMES F. BRIDENSTINE,**
**Administrator, NATIONAL AERONAUTICS**
**AND SPACE ADMINISTRATION,**
**NASA Headquarters**
**300 E Street, S.W.**
**Washington, D.C. 20546-0001,**

**SERVE:**
**James F. Bridenstine**
**Administrator**
**300 E Street, S.W.**
**Washington, D.C. 20546-0001,**

     **Defendant.**

**Civil No:**

## COMPLAINT

**NOW COMES** Plaintiff, Patricia L. Pinney, by and through her undersigned counsel, and, pursuant to Fed. R. Civ. P. 8 and 10, files this Complaint for damages.  Plaintiff states herein as follows:

### JURISDICTION AND VENUE

1.    This action is authorized and instituted pursuant to the Vocational Rehabilitation Act of 1973 ("VRA" or "Rehabilitation Act"), 29 U.S.C. § 794**,** the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623 and the Family and Medical Leave Act of 1990 ("FMLA"), 29 U.S.C. § 2617.  As this Complaint asserts claims arising under the laws of the United States, this Court has original jurisdiction over those claims.

2.      The claims described in this Complaint occurred within this judicial district and venue properly lies in this judicial district.  Defendant is a government employer who is subject to the jurisdiction of this Court.

## PARTIES

3.      Plaintiff Patricia L. Pinney, date of birth June 5, 1953, is a female citizen of the United States of America and resides in the State of Virginia.

4.      Plaintiff is an employee protected by the FMLA, VRA and the ADEA.

5.      Defendant James F. Bridenstine is the Administrator of the National Aeronautics and Space Administration ("NASA" or "Administration") and the designated representative of NASA.

## ADMINISTRATIVE PROCEDURES

6.      On August 28, 2018, Plaintiff met with Ms. Whitney Proctor, a representative of NASA's Office of Diversity and Equal Opportunity ("ODEO"), but was dissuaded by Ms. Proctor from filing an EEO complaint,  Subsequently, after Plaintiff's counsel contacted Mr. Stephen Shih, NASA's Assistant Administrator responsible for the ODEO's operations regarding ODEO's actions in frustrating Plaintiff's efforts to file an EEO complaint, Plaintiff met with an ODEO representative again on December 3, 2018.  She filed an informal complaint of discrimination in December 2018, alleging discrimination and retaliation in violation of the VRA and the ADEA.

7.      On March 12, 2019, Plaintiff filed a formal EEO complaint with the ODEO, alleging unlawful discrimination and retaliation in violation of the VRA and the ADEA.

8.      Defendant has begun investigating the claims in the formal complaint.  On May 22, 2019 Joseph McIntyre, NASA DCFO issued a memo stated after reviewing the anti-harassment investigator's report (requested by Plaintiff), he found Ms. Koren did not violate the Agency's

anti-harassment policy contained in NASA's policy (NPR 3713.3).    Plaintiff is not aware of any other results of the investigation.

9.      More than one hundred eighty (180) days have elapsed from the date of filing of the initial complaint of discrimination and this Court has jurisdiction over the claims asserted in this Complaint.  42 U.S.C. § 2000e-16(c).

10.     All of Plaintiff's claims arising under the ADEA and the VRA alleged in this Complaint were or could be considered during the administrative investigation and they reasonably followed from the allegations contained in the administrative complaint of discrimination and retaliation.

11.     Plaintiff's FMLA claims asserted in this Complaint may be brought directly in this Court and do not require administrative exhaustion.  29 U.S.C. § 2617(a)(2).

12.     Plaintiff therefore invokes her right to bring this civil action in that she has satisfied all administrative and judicial prerequisites to the institution of this action.

## FACTS COMMON TO ALL COUNTS

13. Plaintiff has been employed by the federal government since October 2004.  At all times prior to her employment at NASA, Plaintiff enjoyed a successful career and always was rated as at least a fully successful performer.

14. In November 2015, Plaintiff began her NASA employment as a Policy Analyst in the Policy Division of the Office of the Chief Financial Officer ("OCFO").  As a Policy Analyst, Plaintiff's responsibilities included reviewing and writing policies, researching federal regulations and other policy topics.

15. During the period relevant to this Complaint, Plaintiff has associated with an individual with a disability within the meaning of the VRA, her son.  He lives with severe mental impairments, including schizophrenia.  Beginning on June 14, 2018, Plaintiff's son has lived with her, with

the exception of a two month period (January – February 2019), when he reunited briefly with his wife's family in the People's Republic of China ("PRC"). Plaintiff's son's impairments affect multiple major life activities, including being unable to work. His medical conditions result in him having hallucinations, major stress outbursts, and extreme fatigue. During times that her son has lived with her, Plaintiff has been her son's principal caregiver. At all times relevant to this Complaint, Plaintiff's son has had a serious health condition that requires continuing treatment by health care professionals.

16. Those caregiving responsibilities include ensuring her son's safety during frequent stress attacks, transporting her son to and attending physician appointments, counseling/other therapy and laboratory appointments, monitoring his diet, preparing meals and ensuring that medications properly are administered. Since her son's medical condition is chronic, Plaintiff's caregiving responsibilities have continued, unabated. Although there have been improvements resulting from her son's medical treatments under Plaintiff's care, there have been other periods where her son continues to experience stress attacks and outburst.

17. From the time that Plaintiff began working in the OCFO, she regularly apprised her supervisors of her son's conditions and her caregiving responsibilities.

18. From November 2015 until early November 2018, Plaintiff's immediate supervisor was Ms. Laura Ann Koren, Caucasian, Deputy Director of the Policy Division. Her second-level supervisor was Mr. Kevin Buford, the Director of the Policy Division. Both Ms. Koren and Mr. Buford are younger than Plaintiff. Neither Ms. Koren nor Mr. Buford are disabled within the meaning of the VRA and neither associate with a person that is disabled within the meaning of that statute.

19. On October 29, 2018, Mr. Nestor Tezna replaced Ms. Koren as Plaintiff's immediate supervisor.  Although Ms. Koren no longer was Plaintiff's immediate supervisor, Mr. Tezna reported to Ms. Koren in the Policy Division until March 4, 2018 (at which time Ms. Koren transferred to another office within OCFO).

20. Plaintiff has a history of opposing unlawful employment practices and of participating in protected EEO activities.  In late 2017, a co-worker, Ms. Patricia Currier, initiated an EEO action against Ms. Koren alleging unlawful discrimination and harassment.  An investigation was conducted into the allegations made by Ms. Currier.  Ms. Koren and Mr. Buford were aware of Ms. Currier's complaint and the resulting investigation.

21. Plaintiff provided evidence in Ms. Currier's EEO/harassment complaint, describing Ms. Koren's harassing and intimidating conduct toward Ms. Currier.  Ms. Koren and Mr. Buford were aware of Plaintiff's providing evidence incident to the Currier complaint.

22. Prior to providing her evidence incident to the Currier complaint, Plaintiff had successful mid-term and annual reviews from Ms. Koren and Mr. Buford.

23. In November 2017, after receiving threatening and intimidating e-mails from Ms. Koren, including threats to revoke Plaintiff's telework privileges, Plaintiff forwarded those e-mails to the OCFO's Deputy Chief Financial Officer, Ms. Lisa Ziehmann.  Ms. Ziehmann initiated an investigation of the Policy Division, but on March 23, 2018 concluded in her report titled "Results of Harassment Inquiry" that no harassment had occurred in violation of NASA's policies contained in NPR 3713.3.  Plaintiff learned at the time of Ms. Ziehmann's final report, that Ms. Koren had also initiated an anti-harassment investigation against Plaintiff.  Plaintiff never saw any of the charges brought against her by Ms. Koren.

24. On June 14, 2018, Plaintiff was required to bring her son to live with her and to assume intensive caregiving responsibilities.  In the summer of 2018, Plaintiff's son mental condition, which included schizophrenia, had deteriorated to also include very severe stress and potentially violent attacks.  During the Summer and Fall of 2018, Plaintiff's son was having extreme stress attacks that could only be mitigated if Plaintiff or another caretaker was present to apply medical protocols at an early stage before they escalated.

25. On June 20, 2018, Plaintiff contacted Mr. Fred Johnson, a Human Resources Specialist in NASA's Human Resources Management Division ("HRMD"), regarding taking FMLA leave to care for her son who has a serious health condition within the meaning of § 101(11) of the FMLA, 29 U.S.C. § 2611(11).  Prior to that date, Plaintiff had been permitted to use sick leave when caring for her son.

26. Plaintiff informed Ms. Koren and Mr. Buford of her son's condition and her caregiving responsibilities.

27. In July 2018, a month after it was due, Plaintiff received her annual performance appraisal and was rated as fully successful in all performance areas.  She received a "3" rating on a scale of "1 to 5." This was the lowest rating Plaintiff had received in her federal career; and Plaintiff had not infrequently received ratings at or close to a "5" (Outstanding performer) level.

28. On July 9, 2018, Plaintiff reported to Mr. Buford and Ms. Koren a potential violation of the federal Anti-Deficiency Act ("ADA"), in compliance with federal laws and NASA policy requiring all federal employees to report all known potential ADAs.

29. On July 26, 2018, Plaintiff was charged by Ms. Koren with being absent without leave ("AWOL") after she had a business lunch inside the NASA Headquarters building with both a former NASA policy analyst and a current NASA manager.  Even though it was a business

lunch and Plaintiff's actions were consistent with Policy Division policies and practices, Ms. Koren charged Plaintiff with being AWOL for one hour. The current NASA manager, who also knew the former NASA policy analyst in a business capacity, later told Plaintiff she had properly reported this time as a business meeting.  To the best of Plaintiff's knowledge, other Policy Division employees supervised by Ms. Koren in the HQ Building, including Kelly DiMario, Theresa Howell and Chandran Pillai, regularly were not questioned for taking extended lunch hours by Ms. Koren.

30. On August 27, 2018, Plaintiff was suffering from a severe headache and as a consequence left work thirty (30) minutes early.  Ms. Koren and Mr. Buford appeared to have left their offices for the day; and Plaintiff reported to them by email at the beginning of the next business day of her illness, requesting available sick leave.  Ms. Koren refused Plaintiff's requests of sick leave and then annual leave, instead charging Plaintiff with being AWOL for the thirty (30) minutes.

31.   The Policy Division has no policies or practices in writing to support this action by Ms. Koren. Plaintiff protested to Ms. Koren she was being treated differently from other Policy and OCFO employees.   Ms. Koren responded their discussion was only about Plaintiff.   Plaintiff had observed that other Policy Division employees in the HQ Building: DiMario, Howell, or Pillai would not infrequently start work late, or leave work early, or take extended non-business-related luncheons, for 30 minutes or longer, yet were not charged as being AWOL by Ms. Koren.   The next day, Ms. Koren sent an email to Plaintiff that Ms. Koren must be notified prior to taking sick or annual leave.   Plaintiff verified with her coworkers, this email was not sent to the rest of the Policy Division employees.

32. During July and August 2018, Plaintiff's son was treated by Dr. Robin Ridinger, MD.  Dr. Ridinger agreed that, because of her son's need for caregiving during episodic stress incidents; and to ensure that Plaintiff's son was monitored closely and properly for his safety, medication compliance and nutritional needs -- that Plaintiff apply for family and medical leave.

33. In August 2018, Mr. Johnson provided Plaintiff with Form WH-380-F, Certification of Health Care Provider for Family Member's Serious Health Condition (Family and Medical Leave Act) ("Form 380-H").  On or about, August 23, 2018, Plaintiff provided Mr. Johnson with a Form 380-H completed and signed by Dr. Ridinger dated August 21, 2018 ("Ridinger Certificate I").

34. On August 28, 2018, Plaintiff met with ODEO representative, Whitney Proctor to apprise her that she was being harassed and discriminated against by Ms. Koren, including her placing Plaintiff in AWOL status without justification and her disparate treatment compared to other Policy Division employees supervised by Ms. Koren.  Ms. Proctor told Plaintiff that the type of harassment and discrimination of which she was complaining would not be successfully processed by the ODEO and that any claim had to relate to a personnel action.  Plaintiff filed a complaint form with Ms. Proctor.

35. On August 29, 2018, Mr. Johnson informed Plaintiff that her "request for FMLA entitlements is approved on an intermittent basis" and that she was "entitled to a total of up to 12 workweeks of unpaid leave during any 12-month period."  Mr. Johnson also informed Plaintiff that her supervisor, Ms. Koren, would be notified in a separate communication.

36. Plaintiff subsequently met with Ms. Koren; and Ms. Koren agreed to the following general schedule for a two week, 10-workday period: (1) 6 days of telework, consistent with NASA OCFO policies and practices; (2) 2 days in the office while Plaintiff's husband was home from work; (3) 1 day of alternate work schedule ("AWS"); and (4) 1 day of intermittent FMLA

leave.  In addition, Plaintiff requested additional FMLA time on telework days for doctor's visits and for attending to her son's medical need**s.** Plaintiff calculated at this rate she would not exceed the maximum limits of FMLA time imposed by law for the year.

37. On August 29, 2018, the day that Plaintiff was approved for FMLA leave, Ms. Koren issued her a warning letter concerning her attendance relating to the AWOL "incidents" of July 26 and August 27, 2018.  Ms. Koren characterized these two AWOLS as "repeated instances" when [Plaintiff] failed to inform Ms. Koren she was not in work status, and warned if these continued, this could lead to a loss of telework schedule, AWOLS, and other disciplinary action. Ms. Koren concluded by stating Plaintiff should seek employee counseling services if she had difficulty with the requirements. Prior to Plaintiff's reporting to Ms. Koren, Plaintiff never had received any formal or informal disciplinary communications during her entire career.

38. On August 30, 2018**,** after Plaintiff was approved for FMLA leave, Ms. Koren imposed strict records submission requirements on Plaintiff regarding any FMLA-related absences, requirements that were not imposed on other Policy Division employees, including providing a "signed" doctor's invoice for each visit by the end of each pay period (every two weeks), sending Ms. Koren an e-mail before and after each office visit; plus requiring that all office visits be requested and approved in advance with "adequate notice"  (later interpreted to mean a minimum of one business day) to Ms. Koren.

39.  In addition, Ms. Koren expanded her pre-approval requirement for doctor visits to also include FMLA time that Plaintiff estimated she might need to use for her personal time on telework days (when not on her breaks or during her lunch) to attend to her son's medical needs in her home, especially when he suffered severe stress attacks. Given the unpredictable nature of her

son's illness and medical requirements, this was not practicable to forecast and was contrary

to the purpose of intermittent FMLA leave and Ridinger Certificate I.  The notice, reporting

and approval strictures imposed on Plaintiff by Ms. Koren were not given to other Policy

Division employees that Ms. Koren supervised.

40. In September 2018, Ms. Koren issued Plaintiff a counseling letter and placed her again on

AWOL status.  Plaintiff was charged with being four (4) hours AWOL for the pay period

ending September 14, 2018 for "incidents" where Plaintiff ostensibly was not in compliance

with the strict and unprecedented notice, reporting and approval requirements imposed on

Plaintiff's usage of her approved intermittent FMLA leave.  She was charged with 4 hours

AWOL for the pay period ending September 14, 2018; 2 hours AWOL for September 19, 2018;

and, 3 hours AWOL for September 28, 2018.

41. On October 1, 2018, Plaintiff sent e-mails to Ms. Koren and Mr. Buford providing evidence

why her AWOLs were not proper.  In one example, Plaintiff's son's medical provider told

Plaintiff they would be late providing a "signed" electronic copy of the invoice due to technical

problems.  Plaintiff notified Ms. Koren the "signed" invoice would be a few business days past

the end of the pay period.  Ms. Koren gave Plaintiff AWOLS, and then refused to reverse the

same AWOLS the next pay period after receiving the signed invoices, stating it was Plaintiff's

responsibility to comply with "all" of Ms. Koren's requirements, including time requirements.

42. Although he was cc'd on her emails with Ms. Koren on the above AWOLs, Plaintiff directly

emailed Mr. Buford, Ms. Koren's supervisor, for assistance, and threatened the possibility of

escalating her complaint because of its stress on her.  Mr. Buford spoke on the phone briefly

to Plaintiff on October 1, 2018, stating he did not have time then, but promising to talk to

Plaintiff in the near future. Instead, Mr. Buford never contacted Plaintiff again over the next

few months while Plaintiff reported directly to Ms. Koren.    Nor did Mr. Buford propose or implement any resolution of the issues raised by Plaintiff.

43. On October 3, 2018, Plaintiff requested and was approved for 4 hours leave in the afternoon for her personal annual leave.   At the end of the pay period, Ms. Koren demanded a signed doctor's invoice stating it was still required even though Plaintiff had used her personal annual leave for the medical service for her son. Plaintiff had not requested FMLA leave for that purpose because that form of treatment had not been referenced in Ridinger Certificate I. Ms. Koren next reversed Plaintiff's previously approved annual leave and replaced these with 4 hours of AWOL for the pay period ending October 11, 2018.  Ms. Koren did not take similar actions toward other Policy Division at HQ co-workers DiMario, Howell and Pillai, not in Plaintiff's protected classifications and that had not exercised their FMLA rights or otherwise opposed unlawful practices

44. In early October 2018, Plaintiff sought assistance from Ms. Inez Hunter, a Human Resources Representative in the Office of the Chief Human Resources Officer.  On October 5, 2018, Ms. Hunter sent Plaintiff an e-mail listing available offices to contact, but omitted any reference to what specific NASA office could address Plaintiff's FMLA interference and retaliation claims. Ms. Hunter provided no actual assistance to Plaintiff, but instead gratuitously informed Plaintiff that she had an obligation to share Plaintiff's concerns with Plaintiff's leadership. Plaintiff perceived that comment as evidence NASA HR's sole purpose was to protect management in any conflict with an employee.  Likewise, when Plaintiff had contacted other HR-related offices, Plaintiff was informed their role was to act solely as intermediary between the employee and management.  When Plaintiff noted this would not help her for harassment they suggested Plaintiff file with the Anti-Harassment Office. But Plaintiff's experience with

the Anti-Harassment Office was to be quickly dismissed without being allowed to file a complaint. Also, during this time, Plaintiff was not a member of NASA's union, because her job description as "Accountant" was not covered under the NASA union's collective bargaining agreement.  On October 12, 2018, Ms. Hunter told Plaintiff that any FMLA-related issues would have to be resolved with her managers.  She did not address who would address or resolve Plaintiff's FMLA interference and retaliation claims. Neither before nor following Ms. Hunter's e-mail did Plaintiff's managers express any interest in addressing and resolving Plaintiff's concerns.

45. Earlier in September 2018, Plaintiff told Mr. Buford she was light in projects, and in response he assigned Plaintiff a minor project to design/program a computer screen, known as the "MAX Project."  The screen would simply show comments by reviewers to a given policy. Regarding that assignment, on September 20, 2018, Mr. Buford told Plaintiff that his strategy was they should take it one step at a time to see how the design worked before proceeding to the next step. He also arranged for Plaintiff to receive some training from analysts in other OCFO offices. Between the time that Plaintiff was assigned the MAX Project and a policy to review, Plaintiff sent Ms. Koren regular updates of projects she worked on; which included timely updates and status regarding her activities on the MAX project.

46.  On September 21, 2018, Ms. Koren e-mailed a set of added "deliverables" for the MAX Project, which were administrative in nature, such as to outline key production goals and objectives.  Plaintiff, on October 10, 2018, met with Ms. Koren to review the prototype computer screen for the MAX Project that she had built. Prior to October 10, 2018, Ms. Koren had not participated in either of Plaintiff's two technical meetings to discuss the design of the MAX Project. At the meeting, Ms. Koren did not wish to see the prototype computer screen,

when offered; instead Plaintiff saw Ms. Koren's only interest was to tell Plaintiff she was deficient in meeting "all" of Ms. Koren's administrative requirements.  Plaintiff wrote back to Ms. Koren, that it would be impossible to comply with these administrative requirements until first being assigned a new or revised policy to use with the prototype screen.

47. On October 12, 2018, Ms. Koren responded by assigning a policy for Plaintiff to use with the prototype screen.  Ms. Koren shortly followed up with another email, now ordering Plaintiff to meet with Ms. Koren the following Monday (October 15, 2018) at the office so that Ms. Koren could explain her administrative requirements in person.  Ms. Koren told Plaintiff she was cancelling her telework for the entire day on October 15, 2018 so that she could meet for roughly one hour in her office.   Plaintiff requested to delay the meeting for two days, when her husband would be back home to supervise clinical care for her son.  Ms. Koren refused, stating "[t]elework time cannot be used to take care of a family member."

48.  Plaintiff had previously stopped requesting advance FMLA approval for personal time for her son on telework days that went above her breaks and lunch times, in her attempt to prevent future AWOLs.  Combined with Ms. Koren's pre-requirements for FMLA approval (minimum of one full business day), this made it impossible for Plaintiff to request any FMLA time for the following Monday.  Plaintiff sent her correspondences with Ms. Koren to Mr. Johnson, Ms. Inez, and later Mr. Buford noting that by allowing Ms. Koren to set her own standards for FMLA approval (that were more strict than the FMLA), this permitted Ms. Koren to engage in extreme harassment against Plaintiff.  Plaintiff noted how Ms. Koren was using her powers of FMLA approval to effectively require Plaintiff to choose between her job and the effective abandonment of care of her son for a whole day, during a time period when care of Plaintiff's

son was protected under the FMLA. To this date, Plaintiff has never received any response on this topic.

49. On October 15, 2018, consistent with NASA policies and practices, Plaintiff called in sick. Seeing she was receiving no assistance from any NASA HR office, Plaintiff had spent the previous night under extreme stress, and filed for whistleblowing protection for the first time at the U.S. Office of Special Counsel ("OSC").  Ms. Koren rescheduled the same meeting for October 19th and then again October 23rd; repeating the same pattern of giving only one business day's notice of the proposed meetings, which action Plaintiff recognized blocked her from obtaining FMLA approval for even a portion of the day. On October 22, 2018, Plaintiff provided Ms. Koren with a signed excuse from her dentist for an emergency meeting due to serious damage relating to her dental implant surgery from the previous week.   On October 24, 2018, Plaintiff provided a signed doctor's invoice which noted Plaintiff had reported severe stress for which the physician had written Plaintiff a prescription for stress (Xanax) and also that a lab test found another medical issue affecting her health

50.  Between the dates of October 12-24, 2018, Plaintiff formally attempted again to contact NASA's ODEO (Ms. Whitney Proctor) and NASA's anti-Harassment office (Ms. Leah Hollander), filed for whistleblower protection at the U.S. Office of Special Counsel ("OSC"); and began actively seeking outside legal counsel for protection against harassment.  In her communication with these offices, Plaintiff provided evidence that the policy given to her very recently by Ms. Koren had been assigned to a Policy Division contractor for the previous six months, and that this policy had been scheduled to be completed the previous month.   Yet the contractor relayed to Plaintiff that he had barely started to make any necessary edits.  Plaintiff contrasted the Policy Division's contractor's easy-going attitude on being late on an important

policy with the extreme harassment Plaintiff experienced regarding a simple screen. (MAX project).

51. On October 29, 2018, Mr. Nestor Tezna became Plaintiff's immediate supervisor.  He sent an email to all his employees in Policy Division, notifying them all correspondence should go through Mr. Tezna first, instead of directly communicating with either Ms. Koren or Mr. Buford.

52. On November 20, 2018, Ms. Koren and Mr. Tezna met with Plaintiff to deliver her mid-point performance appraisal for the 2019 performance period.  During that meeting, Ms. Koren told Plaintiff that her NASA employment was at risk and that she was "failing" in several performance elements.  One performance standard that Ms. Koren told Plaintiff she was "failing", stated Plaintiff was to complete a revised or new policy, "if required." When Plaintiff replied to Ms. Koren she had never been assigned this project, making it impossible for anyone to complete, she was informed by Ms. Koren that this didn't matter.  Other reviews made by Ms. Koren were likewise unreasonable and even false, including Ms. Koren's claim Plaintiff had not provided statuses on the MAX Project.  Plaintiff has written evidence to demonstrate this falsity.

53. At that meeting, Ms. Koren also informed Plaintiff that, effective December 3, 2018, her telework privileges were being suspended.  That action was confirmed in an e-mail from Mr. Tezna to Plaintiff on November 20, 2018.

54. Plaintiff's telework privileges were suspended, effective December 3, 2018.   Subsequently, Plaintiff was required to use her accumulated sick leave (5 days per two-week pay period in place of 1-2 days of telework.)   This made Plaintiff less productive at work.  Plaintiff also

calculated this meant she would run out of FMLA time before the end of the year, which
Plaintiff suspected was by design.

55. In November 2018, Plaintiff's son had a new primary care physician, Dr. Carolyn Walsh, MD
who completed a new FMLA form that Plaintiff forwarded to HR. Dr. Walsh agreed with
Plaintiff that, for her son's mental and physical health, Plaintiff should escort him to the PRC
to reunite with his spouse and child and to train her son's spouse on the caregiving required
for her son. The plan was to have him live with his family and for Plaintiff to assist in the
transition of care to her son's spouse. Plaintiff, in December 2018, applied for FMLA for this
trip for that purpose.

56. On December 19 and 21, 2018, Plaintiff's supervisor, Mr. Tezna, denied her FMLA request
stating Mr. Johnson informed him that her use of FMLA would be illegal. Mr. Tezna also
subsequently denied Plaintiff the use of her available annual leave, noting that with her loss of
telework, and resulting increase in FMLA this already made her too unproductive. Without
approved leave, Plaintiff recognized she would be in AWOL status for taking her son to see
and transition care to his family.

57. On December 20, 2018, Plaintiff requested and obtained an Addendum to the FMLA from Dr.
Walsh. In it, Dr. Walsh stated it was her opinion, that Plaintiff should be covered under the
FMLA during her trip out of the country and attempt to transition his care to his wife. Plaintiff
promptly sent Dr. Walsh's Addendum to the FMLA, to both Mr. Tezna and Mr. Johnson.

58. On January 1, 2019, Plaintiff traveled with her son to the PRC, without receiving approval for
leave for her trip. During the entire period that Plaintiff was in the PRC, the federal
government was shut down, and for this reason, Plaintiff was not placed in an AWOL status.

59. On February 7, 2019, Plaintiff met with Mr. Thomas Atherton an inspector from the OIG's office on what Plaintiff assumed from his email/initial discussions would be the first meeting to go over her harassment complaint. During the majority of the meeting, Mr. Atherton encouraged Plaintiff to discuss details of her harassment. Towards the end of the meeting, Mr. Atherton informed Plaintiff that accusations had also been made against her.  Plaintiff responded to these accusations telling Ms. Atherton she believed these accusations were false and absurd.  Plaintiff recognized the charges had originated from her management, and were similar in dirty tricks she knew of from Ms. Currier's claims of harassment.  In a subsequent telephone conversation, Mr. Atherton admitted that another office would be reviewing Plaintiff's harassment complaint; and that his strategy during the interview was to effectively have Plaintiff speak freely in the expectation that she would say something incriminating.

60. After less than two months, Plaintiff was told by her son's wife that her son's condition had become worse.  Plaintiff had sent emails to Mr. Johnson asking what was the status of her FMLA with her son.   Mr. Johnson did not respond to Plaintiff's question before her trip on February 29, 2019.  Plaintiff requested and Mr. Tezna approved her use of available annual leave for her trip.

61. Plaintiff was back at work roughly a week later. On March 7. 2019, Mr. Johnson responded to Plaintiff, after multiple previous email requests, on her status of FMLA.  Mr. Johnson said there had been a determination in December 2018 that Plaintiff no longer qualified for FMLA.  However, upon further review of the December 20, 2018 Addendum to FMLA from Dr. Walsh, this Addendum had resolved the earlier issue. Plaintiff was now approved to use FMLA time for the past trip and going forward.

62. On March 4, Ms. Koren transferred to another position within OCFO. Earlier, Mr. Tezna had

informed Plaintiff, at their first formal meeting to review the MAX project, that he was setting

aside this project for now, stating he was not sure if the project was even needed. On April 2,

2019, Mr. Tezna wrote Plaintiff he was pleased with her work, writing in an email "overall

you have been performing at the satisfactory level or above." As a result, Mr. Tezna permitted

Plaintiff to have two of her three telework days reinstated. No explanation was given to

Plaintiff why she was not reinstated for her third telework day, after being told she was

performing at the satisfactory level.

63. On May 13, 2019, at a meeting for her preliminary mid-term review by Mr. Tezna, Plaintiff

was told by Mr. Tezna she had met all the minimum requirements.   When Plaintiff requested

her third and final telework day also be reinstated, Mr. Tezna hesitated before slowly agreeing.

Without this reinstatement of her full telework time, Plaintiff calculated she would have

exceeded the maximum FMLA time allowed for a year; and based on her December 2018

experience, did not know if she would be approved to use her available annual leave for her

son's care.

64. On June 18, 2018, Plaintiff was delivered a memo dated May 22, 2019 from Joseph McIntyre,

NASA Deputy Chief Financial officer.  This memo stated after reviewing the anti-harassment

investigator's report (requested by Plaintiff), Mr. McIntyre found Ms. Koren did not violate

the Agency's anti-harassment policy contained in NASA's policy (NPR 3713.3).

65. Defendant has taken adverse employment actions toward Plaintiff that individually and

cumulatively affect her wages, hours and terms and conditions of employment, including, but

not limited to issuing counseling and warning letters, placing her in AWOL status, requiring

her to perform job duties that were unreasonable and unachievable, lowering her performance

scores, revoking Plaintiff's telework privileges, threatening her with AWOL charges and subjecting her to intimidating interrogation. Those adverse employment actions taken against Plaintiff were effected contrary to Defendant's policies, procedures, guidelines, regulations.

66. Plaintiff has been treated disparately compared to other similarly situated co-workers in the Policy Division in the HQ Building, including Kelly DiMario, Theresa Howell and Chandran Pillai.

67. As a result of the above-stated actions, Plaintiff has suffered economic damages, including, but not limited to, lost wages and benefits, loss of sick and annual leave, lowering of her performance scores, issuance of disciplinary counseling letters and communications, placement on AWOL status, loss of status and prestige, severe emotional distress, humiliation and embarrassment, medical expenses, attorney's fees and costs associated with this lawsuit.

### COUNT I

### INTERFERENCE WITH THE EXERCISE OF RIGHTS IN VIOLATION OF § 105(a)(1) OF THE FMLA

68. Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation contained in ¶¶ 1 through 67 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

69. At all times relevant to this Complaint, Plaintiff was an "eligible employee" within the meaning of § 101(2) of the FMLA, 29 U.S.C. § 2611(2).

70. At all times relevant to this Complaint, Defendant was an "employer" within the meaning of § 101(4)(A) and (B) of the FMLA, 29 U.S.C. § 2611(4)(A) and (B).

71. At all times relevant to this case, Plaintiff's son has experienced a "serious health condition" within the meaning of § 101(11) of the FMLA, 29 U.S.C. § 2611(11).

72. Since June 20, 2018, when she contacted Mr. Fred Johnson, Plaintiff has sought to exercise

her rights to take family leave as provided in § 102(a)(1)(C) of the FMLA, 29 U.S.C. § 2612(a)(1)(C).

73. Plaintiff provided sufficient notice of her intent to take FMLA leave.

74. Beginning in August 2018 and continuing to the present, Defendant has interfered with, restrained and denied Plaintiff's exercise of her rights guaranteed under §§ 102-104 of the FMLA, including, but not limited to, preventing Plaintiff from obtaining approval of her legal rights to FMLA time, by permitting Ms. Koren to establish her "own" standards for approval even where these were in contradiction to the FMLA, placing her in AWOL status, revoking her telework privileges requiring her to utilize FMLA and annual leave, making secret determinations if Plaintiff was "eligible" for FMLA time without involving either Plaintiff or her son's primary care physician, imposing unreasonable and unachievable job responsibilities, lowering her performance scores, engaging in a campaign and intimidation after Plaintiff exercised her FMLA rights.  At all times, Defendant's actions were willful.

75. After Plaintiff's telework privileges were revoked, Plaintiff suffered economic losses. Defendant's actions in interfering with Plaintiff's exercise of her FMLA rights also has effected a significant loss of job status and prestige.

76. Plaintiff's exercise of rights protected by the FMLA was a motivating factor in the adverse employment actions taken against Plaintiff.

77. The reasons articulated by Defendant for the adverse actions taken against Plaintiff and interference with her FMLA rights are false and pretextual.

78. As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation.

Plaintiff also is entitled, pursuant to § 107(a)(1)(A) of the FMLA, 29 U.S.C. § 2617(a)(1)(A), to liquidated damages of an equal amount for all wages, salary, employment benefits or other compensation lost resulting from Defendant's unlawful violations of the FMLA.

## COUNT II

### RETALIATION AGAINST PLAINTIFF FOR OPPOSING ACTIONS MADE UNLAWFUL UNDER THE FMLA

79. Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation contained in ¶¶ 1 through 78 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

80. Between August 2018 and the present, Plaintiff took steps to oppose the interference with her rights protected by the FMLA by making formal and informal complaints to Defendant's representatives, including, but not limited to Fred Johnson, Laura Koren, Kevin Buford, Whitney Proctor, Inez Hunter, and Leah Hollander.  Ms. Koren and Mr. Buford were aware of such opposition.

81. After Plaintiff opposed practices made unlawful by the FMLA, she was subjected to adverse employment actions, including, but not limited to, preventing Plaintiff from obtaining approval of her legal rights to FMLA time, by permitting Ms. Koren to establish her "own" standards for approval even where these were in contradiction to the FMLA charging her as AWOL, lowering her performance scores, revoking her telework privileges, making secret determinations if Plaintiff was "eligible" for FMLA time without involving either Plaintiff or her son's primary care physician, placing unreasonable and unachievable performance expectations on her, issuing counseling and disciplinary letters and communications and denying leave requests.  Such actions were unlawful under the FMLA, and resulted in Plaintiff suffering immediate economic losses and loss of job status and prestige.  At all times,

Defendant's actions were willful.

82. Plaintiff's opposition to Defendant's conduct was a protected activity.

83. Plaintiff's opposition to practices made unlawful under the FMLA was a motivating factor in the adverse actions taken against Plaintiff described in ¶ 81, above.

84. The reasons articulated by Defendant for the adverse actions taken against Plaintiff are false and pretextual.

85. Defendant violated § 105(a)(2) of the FMLA, 29 U.S.C. § 2615(a)(2).

86. As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation. Plaintiff also is entitled, pursuant to § 107(a)(1)(A) of the FMLA, 29 U.S.C. § 2617(a)(1)(A), to liquidated damages of an equal amount for all wages, salary, employment benefits or other compensation lost resulting from Defendant's unlawful violations of the FMLA.

## COUNT III

## INTERFERENCE WITH PROCEEDINGS OR INQUIRIES IN VIOLATION OF § 105(b) OF THE FMLA

87. Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation contained in ¶¶ 1 through 86 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

88. Beginning in late August 2018, and continuing to the present, Plaintiff informed NASA human resources representatives, including Stephen Shih, Leah Hollander, Inez Hunter, Fred Johnson, Whitney Proctor, as well as her supervisors, Laura Koren, Kevin Buford and Nestor Tezna, that, *inter alia*, she was exercising her FMLA rights and that her managers were interfering with her exercise of those rights and discriminating and retaliating against her for exercising

her FMLA rights.

89. Several efforts to obtain resolution of her complaints about the interference with her FMLA rights, and the resulting discrimination and retaliation, were met with silence and indifference from NASA.  Any action taken by NASA was taken only after letters were sent to NASA from her counsel.

90. Plaintiff's inquiries and efforts to exercise her FMLA rights resulted in the retaliatory adverse actions described in this Complaint, including, but not limited to, placing her in AWOL status, revoking her telework privileges, requiring her to work under reasonable and unachievable performance expectations, lowering her performance scores, engaging in a campaign of intimidation after Plaintiff exercised her FMLA rights.

91. Plaintiff's requests pertaining to her rights under the FMLA were motivating factors in NASA's materially adverse actions taken against her described in this Complaint, including, but not limited to, placing her in AWOL status, revoking her telework privileges, requiring her to work under reasonable and unachievable performance expectations, lowering her performance scores, and engaging in a campaign bullying and intimidation after Plaintiff exercised her FMLA rights.

92. Plaintiff's efforts to seek redress from the interference with and discrimination and retaliation against her for exercising those FMLA rights protected activities under the FMLA were met with indifference and hostility by NASA managers and officials.

93. The reasons articulated by Defendant for the adverse actions taken against Plaintiff are false and pretextual.

94. Defendant took materially adverse actions against Plaintiff that would have dissuaded a reasonable employee from engaging in protected activities in violation of § 105(b)(1) and (2)

of the FMLA, 29 U.S.C. § 2615(b)(1) and (2).

95. As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation. Plaintiff also is entitled, pursuant to § 107(a)(1)(A) of the FMLA, 29 U.S.C. § 2617(a)(1)(A), to liquidated damages of an equal amount for all wages, salary, employment benefits or other compensation lost resulting from Defendant's unlawful violations of the FMLA.

## COUNT IV

## UNLAWFUL DISCRIMINATION IN VIOLATION OF § 504 OF THE VOCATIONAL REHABILITATION ACT OF 1973 BECAUSE OF PLAINTIFF'S ASSOCIATION WITH A PERSON WITH A DISABILITY

96. Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation contained in ¶¶ 1 through 95 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

97. At all times relevant to this Complaint, Plaintiff was qualified for her position as Policy Analyst.

98. At all times relevant to this Complaint, Plaintiff associated with a person, her son, who was an individual with a disability within the meaning of the VRA.

99. At all times relevant to this Complaint, Plaintiff's association with an individual with a disability was known to Plaintiff's managers Koren, Tezna and Buford, as well as NASA managers and representatives, including, but not limited to, Hollander, Proctor, Johnson and Hunter.

100.   After Plaintiff made known that association with a person with a disability to her supervisors and NASA managers, she was subjected to adverse employment actions, including,

but not limited to, charging her as AWOL, lowering her performance scores, revoking her telework privileges, placing unreasonable and unachievable performance expectations on her, issuing counseling and disciplinary letters and communications and denying leave requests. Such actions were unlawful under the FMLA, and resulted in Plaintiff suffering immediate economic losses and loss of job status and prestige.

101.    Those adverse actions occurred under circumstances giving rise to a reasonable inference that Plaintiff's association with an individual with a disability was a determining factor in the adverse actions taken against Plaintiff.

102.    Defendant's actions had the effect of excluding or denying Plaintiff, from the full enjoyment of the terms, conditions and privileges of employment because of her known association with an individual with a disability.

103.    Plaintiff suffered the unlawful adverse actions described above.

104.    Plaintiff's association with an individual with a disability was the determining factor in the adverse actions described above.

105.    The explanations offered by Defendant for its adverse actions are pretextual.

106.    Defendant's actions were unlawful and in violation of § 504 of the Vocational Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

107.    As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation.

## COUNT V

## UNLAWFUL RETALIATION IN VIOLATION OF THE VOCATIONAL REHABILITATION ACT OF 1973

108.    Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation

25

contained in ¶¶ 1 through 107 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

109.     Plaintiff began engaging in protected activities under the VRA in August 2018, when she sought to initiate an EEO complaint regarding the discrimination that she was suffering from her managers Koren and Buford because of her association with an individual with a disability. Those actions have continued to the present, including Plaintiff's filing an informal complaint in December 2018 and a formal complaint of discrimination in March 2019.

110.     Plaintiff has suffered unlawful retaliation by Defendant for engaging in activities protected by the VRA, including, but not limited to, charging her as AWOL, lowering her performance scores, revoking her telework privileges, placing unreasonable and unachievable performance expectations on her, issuing counseling and disciplinary letters and communications and denying leave requests.  Such actions were unlawful under the FMLA, and resulted in Plaintiff suffering immediate economic losses and loss of job status and prestige.

111.     Defendant took materially adverse actions against Plaintiff for her engaging in protected activities.  Such actions would dissuade a reasonable worker from engaging in activities protected by the VRA, including opposing unlawful employment practices and participating in protected EEO activities.

112.     There is a strong causal connection between Plaintiff's protected EEO activities and the materially adverse actions taken against her.

113.     But-for Plaintiff's protected activities, Defendant would not have taken the adverse actions described above.

114.     Defendant's explanations for its actions are pretextual.

115.     Defendant retaliated against Plaintiff in violation of the Vocational Rehabilitation Act of
1973.

116.     As a result of the above-stated actions, Plaintiff has suffered economic and non-economic
damages, including, but not limited to, lost wages and benefits, loss of prestige, severe
emotional distress, medical expenses, attorney's fees and costs related to this litigation.

## COUNT VI

### UNLAWFUL DISCRIMINATION IN VIOLATION OF § 4 OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

117.     Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation
contained in ¶¶ 1 through 116 of this Complaint as though they are fully set forth herein, and
makes them part hereof and, furthermore, states as follows:

118.     Plaintiff is over 40 years of age and is a person protected by the ADEA.  Ms. Koren and
Mr. Buford, the decision-makers in the adverse actions taken against Plaintiff, are substantially
younger than Plaintiff.

119.     Between August 2018 and continuing to the present, Ms. Koren and Mr. Buford took a
series of discriminatory adverse actions toward Plaintiff because of her age, including, but not
limited to, charging her as AWOL, lowering her performance scores, revoking her telework
privileges, placing unreasonable and unachievable performance expectations on her, issuing
counseling and disciplinary letters and communications and denying leave requests.  Such
actions were unlawful under the FMLA, and resulted in Plaintiff suffering immediate economic
losses and loss of job status and prestige.

120.     Plaintiff suffered the unlawful adverse actions described above.

121.     Plaintiff's age was the determining factor in the adverse actions described above.

122.     The explanations offered by Defendant for its actions are pretextual.

123.   Defendant's actions were unlawful in violation of § 4 of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623.

124.   As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation.

### COUNT VII

### UNLAWFUL RETALIATION IN VIOLATION OF § 4(d) OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967

125.   Plaintiff repeats, re-alleges and incorporates by reference each and every factual allegation contained in ¶¶ 1 through 124 of this Complaint as though they are fully set forth herein, and makes them part hereof and, furthermore, states as follows:

126.   Plaintiff began engaging in protected activities under the ADEA beginning in August 2018, when she initially opposed unlawful employment practices by attempting to file an EEO complaint of discrimination.  Those protected activities continue to the present, including filing an informal complaint of discrimination in December 2018 and a formal complaint of discrimination in March 2019.

127.   Plaintiff has suffered retaliation including, but not limited to, charging her as AWOL, lowering her performance scores, revoking her telework privileges, placing unreasonable and unachievable performance expectations on her, issuing counseling and disciplinary letters and communications and denying leave requests.  Such actions were unlawful under the FMLA, and resulted in Plaintiff suffering immediate economic losses and loss of job status and prestige.

128.   Defendant has taken materially adverse actions against Plaintiff for her engaging in protected activities, including opposing unlawful employment practices and participating in

protected EEO activities.  Such actions would dissuade a reasonable worker from opposing such practices.

129.    There is a strong causal connection between Plaintiff's activities protected under the ADEA and the materially adverse actions taken against her.

130.    But-for Plaintiff's protected activities, Defendant would not have taken the adverse actions described above.

131.    Defendant's explanations for its actions are pretextual.

132.    Defendant retaliated against Plaintiff in violation of § 4(d) of the ADEA, 29 U.S.C. § 623(d).

133.    As a result of the above-stated actions, Plaintiff has suffered economic and non-economic damages, including, but not limited to, lost wages and benefits, loss of prestige, severe emotional distress, medical expenses, attorney's fees and costs related to this litigation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Honorable Court grant her the following relief, namely:

(i)      That this Court determines that the employment practices complained of in this Complaint are unlawful in that they violate the Family and Medical Leave Act, the Vocational Rehabilitation Act and the Age Discrimination in Employment Act.

(ii)     That Defendant pays Plaintiff a sum in excess of $300,000 for compensatory damages.

(iii)    That Defendant pays Plaintiff's costs and expenses and reasonable attorney's fees as provided under federal laws in connection with this action.

(iv)     That this Court grants other and such further relief to the Plaintiff as it deems just and proper.

DATED:  JULY 29, 2019.


_____
Nathaniel D. Johnson (MD Bar #14729)
Attorney for Plaintiff
The Johnson Law Office
3261 Old Washington Road, Suite 2020
Waldorf, MD 20602
301 645-9103/888 492-9434 (fax)
ndjesquire@gmail.com