## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PATRICIA L. PINNEY,

                Plaintiff,

     v.

JARED ISAACMAN, *Administrator, National Aeronautics & Space Administration*,

            Defendant.

Case No. 19-cv-2259 (JMC)

## <u>MEMORANDUM OPINION</u>

Patricia Pinney sued the Administrator of the National Aeronautics and Space Administration (NASA)—her former employer—alleging that her managers at the agency discriminated and retaliated against her in myriad ways.[1] Both sides moved for summary judgment. Pinney's motion, ECF 54, is **DENIED** and NASA's, ECF 55, is **GRANTED**. No reasonable jury could find for Pinney on any of her claims.[2]

## I.     BACKGROUND

Although both sides filed motions for summary judgment, Pinney has—as the Court explains further below—effectively abandoned her motion. *See infra* 15–16. The Court therefore only considers NASA's motion for summary judgment and accordingly recounts the evidence here in the light most favorable to Pinney. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

---

[1] Administrator Isaacman has been substituted as the Defendant in this case for his predecessor in office. *See* Fed. R. Civ. P. 25(d). The Court refers to the Defendant as NASA throughout the opinion.

[2] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

### A. Pinney's experience with Laura Koren.

After a stint at the agency in the mid-2000's, Patricia Pinney returned to work at NASA as an accountant in 2015. *See* ECF 56-3 ¶¶ 1–3; ECF 68-2 ¶¶ 1–3. The issues that led to this case began in 2017. Early that year, Pinney missed the first half of a two-hour committee meeting at which she was scheduled to give a presentation. *See* ECF 56-3 ¶ 22; ECF 68-2 ¶ 22 (admitting she missed "roughly half" of this meeting); ECF 57 at 80–82. Another member of that committee then asked Pinney's manager at the time—Laura Koren—to remove Pinney from the committee. ECF 57 at 86. When Koren communicated that request to Pinney and expressed a willingness to try to keep Pinney on the committee, Pinney responded bluntly: "Go ahead and remove me then." *Id.* Koren then removed Pinney from the committee. *See id.*

Within the next month or two, another conflict that plays a role in this case arose. One of Pinney's colleagues filed a complaint against Koren and Pinney provided evidence in the investigation of that complaint. *See* ECF 58-2 ¶ 21; ECF 58-6 at 35–38 (Pinney describing her role in this incident and saying the incident began in "March or April of 2017").[3] Pinney says that in the months that ensued she "receiv[ed] threatening and intimidating e-mails from" Koren, which prompted her to complain to a more senior official in Pinney's division at NASA. ECF 58-2 ¶ 23. That complaint led to an investigation in which the senior official ultimately concluded that "there had been no formal harassment." ECF 68-3 at 24.

Meanwhile, the conflict between Pinney and Koren was roiling. In notes Pinney took, she described a series of complaints Koren lobbed at her. *See* ECF 68-3 at 27–32. Among other things, Koren accused Pinney during this time of "refusing to complete an assignment," *id.* at 27, failing

---

[3] In her opposition to NASA's motion, Pinney argues that she provided evidence in this matter on February 10, 2017. *See* ECF 68-2 ¶ 23. None of the record citations she includes in that section of her filing suggest that date is correct, and her own prior testimony puts the date in March or April of 2017. *See* ECF 58-6 at 35–38; ECF 58-2 ¶ 21 (claiming the incident happened in "Spring 2017").

to "understand . . . work requirements," *id.* at 28, and disobeying the "requirements with regard to Telework," *id.* at 31. This string of events culminated in Pinney's "interim" performance review in November 2017. *Id.* Both Koren and Koren's manager—Pinney's second-level manager—attended that review. *See id.* at 31–32 (describing Koren and Kevin Buford's conduct during this meeting); ECF 56-3 ¶ 8; ECF 68-2 ¶ 8. The second-level manager told Pinney that "people were complaining" about her and "did not like" her, that he "could claim" Pinney had "been harassing" a coworker, and that she "was incompetent," did "sloppy" work, and "could not be trusted." ECF 68-3 at 31–32. Despite the harsh feedback at that "interim" performance review, when Pinney received her final performance review for the year around seven months later, she was given a rating of "Level 3 Fully Successful." ECF 57 at 55. That score was in the middle of the scale that ran from "Level 5 Distinguished" and "Level 4 Accomplished," to "Level 1 Unacceptable," with seemingly no option to give a "Level 2" score. *Id.*

Things were apparently calmer for Pinney in the first half of 2018, but that summer her conflict with her supervisors kicked off again. *See* ECF 58-2 ¶¶ 23–26, 29 (Pinney describes the next incident after she complained in November 2017 as taking place in summer 2018). That summer, Pinney's son's schizophrenia worsened. *See id.* ¶ 26. So that she could care for her son, she contacted a human resources specialist to ask about using Family and Medical Leave Act (FMLA) leave. *See id.* ¶ 27. Around the same time, Koren took away some of Pinney's substantive responsibilities, "severely curtailing [Pinney's] workload." *Id.* ¶ 29.

Then, another dispute about Pinney's attendance arose. At the end of July 2018, Pinney went to what she describes as a "business lunch" with a "former NASA policy analyst and a current NASA manager." *Id.* ¶ 30. Building records show that Pinney left her building at NASA at 11:57 A.M. and returned at 2:03 P.M. ECF 56-3 ¶ 38; ECF 68-2 ¶ 38 (admitting that time stamps are

uncontested). But when Pinney entered her hours for that day in July, she did not account for the missed time, instead recording her time as if she had worked a full day. *See* ECF 56-3 ¶ 39; ECF 68-2 ¶ 39 (explaining why she felt she was justified in not modifying time, but not denying she entered time this way); *see also* ECF 57 at 104. After some back and forth between Koren and Pinney about Pinney's time sheet, Koren charged Pinney with being "AWOL" (absent without leave) for one hour. *See* ECF 68-12 at 2; ECF 68-13 at 2. Pinney says this was unjustified. She testifies that her second-level supervisor was "aware of" this lunch meeting and says that the other NASA employee at the meeting also "reported" the "meeting as a business meeting." ECF 58-2 ¶ 30. Pinney also says that she attempted to edit her time entry to use leave for the lunch after Koren confronted her about the issue, but that Koren's directions were unclear and led her to only use an hour of leave rather than the two hours that Koren was apparently requiring. ECF 68-2 ¶ 40.

Several days after Koren issued Pinney the AWOL citation for this lunch, Koren and a human resources specialist met with Pinney to discuss her request for FMLA leave. ECF 56-3 ¶ 41; ECF 68-2 ¶ 41. Koren emailed Pinney after that meeting to memorialize their discussion. *See* ECF 57 at 106; *see also* ECF 56-3 ¶ 42; ECF 68-2 ¶ 42. Koren instructed Pinney that "Telework cannot be used as a method to care for a loved one." ECF 57 at 106. Koren also laid out the requirements for Pinney's use of FMLA leave, including that Pinney would request the leave in advance wherever possible. *See id.* Koren concluded that "FMLA still requires an employee to adhere to authorized and established work schedules[,] as the purpose of FMLA is to provide a work/life balance while still meeting work requirements as work still has to get done." *Id.*

Within the next month, Pinney had further issues with Koren related to leave. At the end of August, Pinney left the office 30 minutes early because she was suffering a "severe headache." ECF 58-2 ¶ 33. Pinney says that Koren and her second-level supervisor "appeared to have" already

"left their offices" when Pinney was leaving that day, but Pinney "reported to them by email at the beginning of the next business day" and asked "to use available sick or annual leave." *Id.* Koren, however, "refused" Pinney's request and charged Pinney with being AWOL for 30 minutes. *Id.* ¶ 34. That same week, Koren sent Pinney an email "confirm[ing] [their] conversation . . . concerning [Pinney's] unscheduled leave usage." ECF 57 at 114. Koren wrote that, "[o]ver the past several months," Pinney had "taken an increased amount of unscheduled absences," and that there had "been repeated instances" in which Pinney had "failed to inform" Koren that Pinney was "not in a work status." *Id.* Koren then listed her expectations for Pinney with regard to leave and included a bulleted list of issues Koren had identified with Pinney's time keeping for the "current pay period." *Id.* at 114–15. The letter concluded by warning Pinney that "unscheduled absences may lead to administrative actions" and that "AWOL charges or any misconduct" could "result in disciplinary action." *Id.* at 115. Then, within the next couple of days, Koren sent Pinney another email informing Pinney that going forward she needed to provide a doctor's note for any medical appointment that took place during Pinney's official work hours. *See* ECF 57 at 120; ECF 58-2 ¶ 42; ECF 56-3 ¶ 52.

Two weeks later, Koren issued Pinney a "counseling" letter "concerning [Pinney's] failure to follow" the directions Koren had outlined. ECF 57 at 122. Koren wrote that although she "could have issued [Pinney] a disciplinary action" based on her conduct, Koren would instead "like to work with [Pinney] to establish better communication." *Id.* Koren "advised" Pinney "that future incidents of this type . . . may result in AWOL charges, telework termination and/or disciplinary action," but confirmed that the counseling letter "is non-disciplinary." *Id.* Despite that, in an email Koren sent the same day she sent the letter, Koren informed Pinney that she was issuing AWOL charges for two recent days on which Koren said Pinney entered time for doctor's appointments

but did not submit doctor's notes before the end of the relevant pay period. *See id.* at 126. Pinney points out that she emailed Koren the day before the pay period ended notifying her that she was "waiting for the medical invoices," to which Koren responded that she was "not waiting for the medical invoices" but instead needed only a doctor's note "that state[d] the day and time of the appointment." ECF 68-3 at 56. And Pinney did ultimately submit a doctor's note for these two appointments, but she acknowledges that she did so after the pay period ended. *See* ECF 68-2 at 25 (describing Pinney Decl., Ex. I, filed at ECF 68-3 at 62).

In the next month, Koren charged Pinney with being AWOL five more times. *See* ECF 56-3 ¶¶ 59, 67; ECF 68-2 ¶¶ 59, 67 (Pinney contests whether the AWOL notices were "authorized" and seeks to explain why they were not justified but does not contest that Koren issued them). Meanwhile in that same month, Koren and Pinney were in conflict about whether Pinney was performing her work as expected. Pinney had recently been assigned a project by her second-level supervisor. *See* ECF 58-2 ¶ 53. When Koren met with Pinney to discuss the project, Koren told Pinney that Pinney had failed to meet certain "deliverable requirements" Koren had set for the project. *Id.* ¶ 55. Pinney then asked Koren for resources she would need to meet those requirements but says the tool Koren provided was not yet usable. *See id.* ¶ 58. That same day, Koren cancelled Pinney's scheduled telework for later in the week and told Pinney that she should be in the office to meet with Koren. *See id.* ¶ 59. Pinney asked Koren to delay the meeting for two days because Pinney's husband was travelling at the time and unavailable to stay home with their son while she went to the office. *See id.* ¶ 60. Koren refused that request and Pinney then called in sick on the day of the scheduled meeting. *See id.* ¶¶ 60, 62. Koren rescheduled that meeting, and Pinney again used sick leave on the date of the rescheduled meeting. *See id.* ¶¶ 63–64; *see also* ECF 57 at 136.

The week of the cancelled in-person meetings, Pinney contacted NASA's Office of Diversity and Equal Opportunity and NASA's Anti-Harassment office "regarding the ongoing harassment and discrimination" that Pinney was "experiencing from Ms. Koren." ECF 58-2 ¶ 65. And within a few weeks, in early November 2018, Pinney's attorney had notified NASA of "his representation and Ms. Koren's ongoing harassment concerning [Pinney's] usage of FMLA and other leave." *Id.* ¶ 51.

### B. Pinney's experience with Nestor Tezna.

In the meantime, however, Pinney was assigned a new manager. At the end of October 2018, Nestor Tezna became Pinney's immediate supervisor. ECF 56-3 ¶ 6; ECF 68-2 ¶ 6. Tezna, in turn, reported to Koren. ECF 56-3 ¶¶ 6–7; ECF 68-2 ¶¶ 6–7. When it was time for Pinney's interim review in November 2018, both Tezna and Koren attended. ECF 58-2 ¶ 67. Koren "led the meeting." *Id.* She told Pinney that her "NASA employment was at risk" and that she was "failing in several performance elements." *Id.* Koren also told Pinney that her "telework privileges were being suspended." *Id.* ¶ 68. Pinney "wrote a rebuttal" of Koren's "charges against [her] in [her] mid-term performance review," and, among other things, claims that Koren "admitted" she "never assigned" Pinney one of the projects that Koren accused her of "failing" in the review. *Id.* ¶ 67.

Around the time of the review or shortly thereafter, Tezna began to change some of the leave requirements Koren had imposed on Pinney. *See* ECF 58-2 ¶ 68. He "rescinded . . . Koren's documentation and notification requirements" for Pinney's usage of FMLA leave. *Id.* That, Pinney says, allowed her to "use the same sick-time requirements as [her] coworkers." *Id.* And because her telework privileges had been suspended, Pinney was in fact using more FMLA leave in this period. Whereas she used one day of FMLA leave per pay period while she was allowed to telework, she was now using five days of FMLA leave per period. *See id.* ¶ 69.

Pinney did have an incident related to her use of FMLA leave in December 2018. That month, Pinney asked to use four weeks of her annual leave so that she could take her son to China. *See* ECF 58-2 ¶ 70; ECF 57 at 28:23–29:9. Pinney explained to Tezna that her "son was suicidal unless he" could travel to China "to visit his son on his first birthday." ECF 58-2 ¶ 70. Pinney hoped that while she was in China with her son, she could prepare her son's wife to care for the son so that he could stay in China. *See id.* That, Pinney told Tezna, would enable Pinney to stop using FMLA leave when she returned from the trip. *See id.* Tezna denied Pinney's request to use her annual leave for this trip. *See id.* In response, Pinney applied to use FMLA leave, rather than annual leave, for the same trip. *See id.* ¶ 71. That leave request was denied too. *See id.* ¶ 72. But within days of the denial, the federal government shut down and Pinney was furloughed. ECF 56-3 ¶ 85; ECF 68-2 ¶ 85. Because she was furloughed for the entirety of the trip, Pinney was able to travel to China despite the denial of her leave requests. ECF 56-3 ¶ 86; ECF 68-2 ¶ 86; ECF 57 at 27:8–15. And based on additional documentation that Pinney submitted two days before the government shutdown began, NASA ultimately determined—retroactively—that Pinney was allowed to use FMLA leave for the China trip. ECF 56-3 ¶¶ 83, 87–88; ECF 68-2 ¶¶ 83, 87–88.

Despite this hiccup, things seemingly went well between Tezna and Pinney in the first half of 2019. *See* ECF 56-3 ¶ 92; ECF 68-2 ¶ 92. In early April, Tezna told Pinney that he was "pleased with the work [she had] been doing" and that he thought that "overall [she] ha[d] been performing at the satisfactory level or above." ECF 57 at 153. He reinstated her telework privileges and allowed her to work remotely two days a week. *See id.* Shortly thereafter, he upped the number to allow three days a week. *See* ECF 58-2 ¶ 78. In the annual performance review that Tezna delivered in the first half of 2019—the review covered the period from May 1, 2018, to April 30, 2019—Tezna rated Pinney as "Level 3 Fully Successful." ECF 60-1 at 1.

But things took a turn in August. Pinney had recently given Tezna a NASA policy document she had rewritten. ECF 56-3 ¶ 93; ECF 68-2 ¶ 93. After reviewing the policy, Tezna "notified [Pinney that] he was not satisfied with" the work she had done. ECF 57 at 9. Tezna apparently did not want Pinney to "rewrite" the policy document, but instead to start with the existing policy document's text and "only mak[e] necessary changes to it." *Id.* In response, Pinney explained why the "policy had been rewritten," but Tezna "remained firm" that Pinney "was to start with the older, original policy and to 'keep' as much as possible." *Id.* at 9–10. Tezna gave Pinney twelve days to turn in the revised draft. *See* ECF 58-2 ¶ 83.

During those twelve days, Tezna gave Pinney some additional direction. First, Tezna forwarded Pinney an email with information about the compliance review process that applies to policy documents and asked Pinney to "ensure that" she followed that direction in completing the policy documents she was working on. ECF 57 at 157. Next, a couple of days after that, Tezna sent Pinney an email in which he provided bulleted feedback on Pinney's draft of the policy document. *See* ECF 57 at 161. In that email, Tezna wrote that he was "concerned" that he was "not able to use [Pinney's] revision" because he was "having to rewrite nearly every paragraph and every section." *Id.* Tezna sent back to Pinney what he had "done so far" so that she could "see the changes" he had made and asked Pinney to "give [it] another try." *Id.* He concluded the email with a note that, because Pinney was a "senior policy analyst," Tezna "expect[ed] a higher level of care and caution when updating policies." *Id.*

Pinney, for her part, thinks Tezna's criticism of her rewrite was unfounded. She points out that she had worked on the rewrite in "late 2018 and 2019"—indeed she testified that she had been working on the project since 2016, *see* ECF 58-6 at 66—and it had already been "reviewed and approved" by Koren and Koren's supervisor. ECF 58-2 ¶ 81. Pinney chalks Tezna's criticism of

this policy document up to retaliation. On July 29, 2019—the day before she gave Tezna the first draft of this policy document—she filed her complaint in this case. *See* ECF 1; ECF 68-2 ¶ 93.

Pinney submitted a revised version of the policy document on September 16, 2019. ECF 56-3 ¶ 106; ECF 68-2 ¶ 106. Around a month later, Tezna sent Pinney a warning letter notifying her that her "performance" on the policy document "was at unacceptable levels." ECF 57 at 11. In that letter, Tezna "cited examples of issues with [Pinney's] last revision." *Id.* A week after she received the letter, Pinney responded, "rebutting" each of the examples Tezna identified. *Id.*

Meanwhile in September, two other relevant events took place. First, Tezna announced a change to the telework policy for his entire division. ECF 56-3 ¶ 103; ECF 68-2 ¶ 103. Everyone would now be limited to two days of telework per week, and everyone was required to be in the office on Tuesdays. ECF 56-3 ¶ 103; ECF 68-2 ¶ 103. Pinney, however, informed Tezna that she could only come in every other Tuesday. *See* ECF 57 at 166. That was because her husband's work schedule did not allow him to stay home every Tuesday "to monitor [their] son's mental control." *Id.* Tezna agreed to allow Pinney to telework on the Tuesdays she needed to stay home. *See id.* at 165. Second, at the end of September, Pinney contracted shingles. *See* ECF 58-2 ¶ 87. Pinney told Tezna about her diagnosis. *See* ECF 57 at 165.

As for the conflict about the policy document, Pinney's "rebuttal" of Tezna's warning letter did not put the issue to rest. *See* ECF 58-2 ¶¶ 89–90. Rather than respond to that letter, Tezna's next step was to issue a performance improvement plan. *See id.* ¶ 90. The plan described Pinney's performance as "unacceptable" and said it was being implemented "to afford [Pinney] a demonstration period to raise [her] performance to at least the minimal acceptable level of 'Fully Successful.'" ECF 57 at 168. According to the document, Pinney was "failing to . . . [p]rovide comprehensive, clear, and concise advice, assistance and interpretive guidance on complex issues

in Supervisor assigned Subject Matter area of expertise to stakeholders." *Id.* at 169. The document listed Pinney's work on the revised policy document as an "example[]" of her "unacceptable performance." *Id.* And the "[r]equirement" for her to "bring [her] performance up to" the needed level was to complete the revised version of that policy as laid out in the performance plan. *Id.* The plan was effective from November 1 to December 3, 2019. *See id.* at 168. On December 3, Pinney's "performance [would] be reviewed and rated based on the criteria outlined" in the plan. *Id.*

When Tezna emailed Pinney a copy of the performance improvement plan, he asked her to submit her revised version of the policy document by November 22. *See* ECF 57 at 177. A few days later, Pinney had her "first (and last) meeting with . . . Tezna about" the performance plan. ECF 58-2 ¶ 93. At the meeting, Tezna "handed" Pinney a "printed copy of [her] last submission with his comments handwritten to the side." *Id.* According to Pinney, Tezna "emphasiz[ed] that his 'comments' primarily were questions." *Id.* Pinney "typed all of . . . Tezna's comments into [her] next submission and made the edits indicated." *Id.* ¶ 94.

Around the same time as that meeting, Tezna moved Pinney from her "office cubicle within" her division's area "to a cubicle" in a "common area." ECF 58-2 ¶ 92. Her new location was "isolated," "unsecure, noisy[,] and generally used for . . . meetings and birthday parties." *Id.* Coworkers asked Pinney "[w]hat happened." *Id.* Pinney's second-level supervisor at the time— Koren had by this point moved on from that role—testified that Pinney was moved from one of the "preferred spaces" to "one of the two wors[t] places in the whole office." ECF 58-5 at 8. He also explained that Pinney was the "only person" at her seniority level who was moved, and that he was "surprised" Tezna had made Pinney move. *Id.* at 6, 8.

Turning back to the revisions of the policy document, Pinney gave Tezna her revision on November 15, which she described at the time as the due date. *See* ECF 57 at 180. It is unclear

when or why the due date changed from November 22—as indicated in Tezna's email delivering the performance plan—to November 15. After Pinney turned in her revised version, Tezna told her he was "too busy to review" the performance plan. ECF 58-2 ¶ 95. But Tezna did assign Pinney another project on November 15. *See id.* ¶ 96. He asked Pinney to revise a different policy document and set an "aggressive deadline" of December 6. *Id.* Pinney describes this new project as "major" and "complex," and says that, as of November 2023, a public NASA database estimated its date of completion as December 24, 2024. *Id.* ¶ 97. Near the end of November, Pinney was experiencing technical problems with her computer so requested an extension of two business days for this project, which pushed the deadline to December 10. *See* ECF 57 at 184. Tezna had previously offered a one-day extension, but he approved the additional day when Pinney asked for it. *See id.* A week later, Pinney told Tezna that she would not be able to meet the extended deadline. *See id.* at 186–87. She had experienced further technical problems and lost saved versions of her work, and apparently had come to realize that the project was more complex than she initially thought. *See id.* Pinney said she would "work steadily on th[e] project" but said she could not "give [Tezna] a deadline" of when she would "complete th[e] project." *Id.* at 187.

In her email notifying Tezna that she would not make the deadline, Pinney also discussed another recent event that was making it difficult for her to complete the project. In early November, Pinney had been diagnosed with breast cancer. *See* ECF 58-2 ¶ 91. In this email in early December, Pinney told Tezna that it was "stupid" for her to "hav[e] this kind of pressure on [her] right now" because she was "on the fast track for a lumpectomy surgery" and had a range of things to deal with given her cancer diagnosis. ECF 57 at 187.

Tezna responded to this email the next day. He wrote that if Pinney was "planning to take time off due to illness [he] would imagine that [Pinney] would need to plan (especially if it's

surgery)." ECF 57 at 190. As for Pinney's explanation that she could not make the deadline or set a new one, Tezna wrote: "I am not sure what you mean by you can't provide me a deadline. I actually have given you a deadline and extended it once already. I can extend it again and give you through December 19th to complete." *Id.* Tezna also extended the end date on Pinney's performance plan to December 19 "for this reason as well." *Id.* Pinney responded almost immediately to Tezna "[a]gree[ing]" that "an additional week should be about right," but saying "let's make the deadline due COB Friday December 20th, instead of Thursday." *Id.* Tezna did not object to Pinney's proposal of moving the deadline. *See* ECF 56-3 ¶ 127; ECF 68-2 ¶ 127. Pinney ultimately submitted this project on December 22. *See* ECF 58-2 ¶ 105.

Tezna never responded to Pinney about this project. *See* ECF 58-2 ¶ 105. Instead, at their next meeting on January 15, he gave Pinney a notice of proposed removal. *See id.* ¶ 107; ECF 57 at 194 (document is dated January 14). In that letter, Tezna notified Pinney that he was "proposing to remove [her] from her position." ECF 57 at 194. He also told Pinney—for the first time, she says—that she had "failed to demonstrate acceptable performance" during her performance plan. *Id.* at 195; *see* ECF 58-2 ¶ 107. Tezna explained that "[a]fter three attempts at revising" the policy document that was the subject of the performance plan—not the second one that he assigned while Pinney was on the performance plan—"the document [Pinney] submitted still requires a significant number of updates before it can be moved forward to the next phase in the policy review cycle." ECF 57 at 195. Tezna then gave several examples of issues with Pinney's revision of the document. *See id.* The notice of proposed removal concluded with a section outlining Pinney's "right to answer" the notice "orally and/or in writing" within 15 calendar days and explained that "[n]o final decision will be made until [her] reply or replies have been received and considered, or if no reply is received, until after the 15-day time period has expired." *Id.* at 196.

On January 30, Pinney submitted her response to the notice, arguing that it should be "rescinded or withdrawn." ECF 56-3 ¶ 136; ECF 68-2 ¶ 136; *see* ECF 57 at 204–11. The same day, Pinney applied to retire, with her retirement effective the very next day. *See* ECF 57 at 202. Pinney had not been planning to retire prior to receiving the notice of proposed removal but made the decision to do so in light of her mental health care provider's "recommendation that [Pinney] take a leave of absence" and what Pinney describes as the "vile discrimination and retaliation" she was experiencing at work. ECF 60-10 at 1; ECF 58-2 ¶ 109. Because Pinney retired, NASA "canceled" Pinney's proposed removal and no decision was made as to whether she would, in fact, be removed. ECF 57 at 201; *see* ECF 56-3 ¶ 139; ECF 68-2 ¶ 139 (not contesting this aspect of NASA's statement of undisputed facts).

### C. This lawsuit.

Pinney's complaint was already pending in this Court at the time of her retirement. *See* ECF 1. The then-assigned Judge stayed the case in March 2020 to allow Pinney time to administratively exhaust additional claims that she wished to add to her complaint given her retirement. *See* ECF 11. In January 2021, Pinney filed an amended complaint. *See* ECF 16. The amended complaint alleges that a slew of actions taken by Pinney's managers—the AWOL notices, leave requirements, performance reviews, letters of warning, performance improvement plan, notice of removal, and several other actions, *see, e.g.*, *id.* ¶ 105—violated the Family and Medical Leave Act, the Rehabilitation Act, and the Age Discrimination in Employment Act. *See id.* ¶¶ 98–175. Pinney also brings a claim for constructive discharge. *See id.* ¶¶ 176–84. Both sides moved for summary judgment. *See* ECF 54; ECF 55.

## II.    LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The Court "may neither make credibility determinations nor weigh the evidence." *Steele v. Mattis*, 899 F.3d 943, 947 (D.C. Cir. 2018). "Instead, summary judgment is proper only when, viewing the evidence in the light most favorable to the plaintiff and drawing all reasonable inferences accordingly, no reasonable jury could find in the plaintiff's favor." *Id.*

## III.    ANALYSIS

Pinney brought nine claims in her complaint. *See* ECF 16 ¶¶ 98–184. She has abandoned the first three of those claims, all of which arose under the Family and Medical Leave Act. *See id.* ¶¶ 98–125; ECF 68-1 at 9 n.3 ("Plaintiff . . . does not object to the dismissal of Counts I–III of her Amended Complaint."). The Court therefore grants judgment to NASA on those counts.

That leaves Pinney's claims for disparate treatment, retaliation, and constructive discharge under the Rehabilitation Act and Age Discrimination in Employment Act (ADEA). As to those claims, Pinney has effectively conceded the Court must deny her motion for summary judgment. The opening sentence in her reply brief says that the "main facts in this case are disputed such that a jury trial is warranted." ECF 71 at 4. That assertion, of course, squarely contradicts Pinney's request for summary judgment. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Nor is Pinney's fallback request coherent. She says that if "there are not enough genuine issues of material fact" to warrant a trial the Court should grant her summary judgment because "the preponderance of [the] evidence weighs in her favor." ECF 71 at 4. But Pinney "bears the burden of proof" on her claims at trial; that means to win on summary judgment she must "demonstrat[e] why the record is so one-sided as to rule out the prospect of" NASA "prevailing" at trial. Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2727.1 (4th ed. 2025). Pinney would therefore not be entitled to summary judgment even if she

was right that the "preponderance of [the] evidence weighs in her favor." ECF 71 at 4. Given the position Pinney took in her reply brief, the Court denies her motion for summary judgment. The Court takes NASA's motion for summary judgment on each of the remaining claims in turn.

### A. Associational discrimination on the basis of Pinney's association with her son

"The Rehabilitation Act prohibits federal agencies from engaging in employment discrimination against disabled individuals." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016). Among other things, the law prohibits federal employers from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); *see* 29 U.S.C. § 791(f) (Rehabilitation Act incorporating this provision of Title I of the ADA).[4] Pinney claims that her managers violated that prohibition, subjecting her to several adverse employment actions because of her son's disability.

On a defendant's motion for summary judgment "in an association case," the "question . . . is whether the plaintiff has adduced sufficient evidence from which a reasonable jury could infer that the defendant terminated her because of her" associate's disability. *Chisholm v. District of Columbia*, 666 F. Supp. 2d 96, 111 (D.D.C. 2009). Crucially, "there is a distinction between" taking adverse action against "an employee because of a relative's disability" and taking adverse action against "an employee because of the need to take time off to care for the relative." *Id.* (citing *Erdman v. Nationwide Ins.*, 582 F.3d 500, 509–10 (3d Cir. 2009)). The former is

---

[4] NASA has not argued that associational discrimination is not cognizable under the Rehabilitation Act. Given the Act's incorporation of the standards from Title I of the ADA, the Court has no reason to doubt that it is. *See Brown v. Snow*, 407 F. Supp. 2d 61, 67 (D.D.C. 2005) (noting that the Rehabilitation Act "expressly incorporates the standards of the ADA for claims of employment discrimination"); *Popovich v. Cuyahoga Cnty. Ct. of Common Pleas*, *Domestic Rels. Div.*, 150 F. App'x 424, 427 (6th Cir. 2005) (rejecting claim that "the Rehabilitation Act does not have an associational discrimination component"). Nevertheless, because the issue is not briefed here the Court will merely assume without deciding that the Rehabilitation Act, like Title I of the ADA, prohibits associational discrimination.

unlawful discrimination "because of the known disability of an individual with whom" the employee has a relationship, 42 U.S.C. § 12112(b)(4), while the latter is not.

Pinney's associational discrimination claim fails because no reasonable jury could conclude that she suffered adverse employment actions because of her son's disability. Pinney first identifies Koren's imposition of AWOL citations and "draconian, unauthorized and unprecedented leave approval requirements" as relevant adverse employment actions. ECF 54 at 32. The problem for Pinney on this front is that the story with these actions begins in 2017, well before she told her managers about her son's medical condition—indeed, even before she claims to have begun associating with an individual with a disability. *See* ECF 58-2 ¶¶ 4, 9. It was early in 2017 that Pinney arrived an hour late to the meeting at which she was scheduled to present. *See* ECF 56-3 ¶ 22; ECF 68-2 ¶ 22. And later in 2017, Koren again accused Pinney of disobeying the "requirements with regard to Telework." ECF 68-3 at 31. Koren's issues with Pinney's attendance and teleworking therefore began well before Koren was aware that Pinney was associating with a person with a disability. That Koren's proffered reason for imposing AWOL citations and stringent leave requirements—Pinney's apparent difficulties in consistently working her expected hours— existed before the associational disability arose undermines Pinney's discrimination claim. *Cf. Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

The timeline similarly dispels Pinney's claim that Tezna discriminated against Pinney because of her son's disability. Recall that Tezna became Pinney's supervisor late in 2018, but

that—after some initial issues related to Pinney's trip to China[5]—things went well between he and Pinney until the end of July 2019. *See* ECF 56-3 ¶ 92; ECF 68-2 ¶ 92. But Pinney also testifies that, "[b]eginning in June 2018," she "regularly told [her] managers about [her] son's medical condition and [her] caretaking responsibilities." ECF 58-2 at 2. So Tezna was aware of Pinney's son's disability throughout the entire first half of 2019, during which time Pinney says she had no issues with Tezna. There is nothing in the record to suggest that the change in August 2019 was related to or caused by Pinney's relationship with her son. If Tezna "did not want to work with" Pinney because of Pinney's association with her son, "it would be odd" to treat her well for half-a-year before suddenly "start[ing] [to] gin[] up reasons to dismiss her." *Vatel v. All. of Auto Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011). Pinney does, to be sure, have a theory of what led to the change in Tezna's behavior—she filed this lawsuit. The Court addresses that claim below, but it suffices to say here that this fact does not support her claim of associational discrimination.

Because the record Pinney has compiled suggests that, at worst, NASA treated her worse because of "actions occasioned by [her] association" with a person with a disability—her need to take significant amounts of leave and regularly work from home—no "reasonable jury could infer that" NASA discriminated against Pinney "because of her [son's] disability." *Chisholm*, 666 F. Supp. 2d at 112. NASA is therefore entitled to judgment on this claim.

The Court does not reach NASA's argument that Pinney has not exhausted many, if not all, of the discrete claims she bundles into her associational disability claim. *See* ECF 55-1 at 14. NASA does not contest that Pinney "filed and received a final disposition of her administrative complaint." *Doak v. Johnson*, 798 F.3d 1096, 1104 (D.C. Cir. 2015); *see* ECF 56-3 ¶¶ 142, 156;

---

[5] Pinney concedes that the initial denial of her leave request to travel to China does not constitute an adverse employment action because, given the government shutdown, she was able to take the trip and ultimately was granted permission to use FMLA leave for the trip. *See* ECF 68-1 at 39 n.32.

ECF 68-2 ¶¶ 142, 156. NASA's argument is that the administrative complaint did not include the claims she is pressing here. *See* ECF 55-1 at 14. Because "issues concerning how a claimant participates in th[e] administrative process, both procedurally and substantively, are not of jurisdictional moment," *Doak*, 798 F.3d at 1104, the Court need not address these questions and can instead rest on the independent ground that Pinney has failed to create a genuine dispute as to whether NASA discriminated against her because of her son's disability.

### B. Discrimination on the basis of Pinney's disability

In addition to her claim that NASA discriminated against Pinney because of her association with a person with a disability, Pinney also claims NASA discriminated against her because of her own disabilities—shingles and breast cancer. *See* ECF 16 ¶¶ 138–49 (Count V). While the Court did not need to address NASA's exhaustion argument as to the associational discrimination claim, that defense is dispositive for this claim.

"The Rehabilitation Act requires individuals to exhaust administrative remedies before they can file suit to enforce the Act's protections." *Doak*, 798 F.3d at 1099; *see* 29 U.S.C. § 794a(a)(1) (Rehabilitation Act adopting the "remedies, procedures, and rights" in the federal employment provisions of Title VII, which includes administrative exhaustion). Although the exhaustion requirement is undisputable, there is a dispute in this case about how to determine whether it was satisfied. Pinney argues that so long as her claims in federal court are "like and related to[] or grow out of" the claims she put before the agency, she has satisfied the exhaustion requirement. ECF 71 at 5. NASA, on the other hand, argues that "each discrete claim of discrimination or retaliation must be separately exhausted." ECF 55-1 at 13.

The parties' disagreement reflects an unsettled legal question in this Circuit. In *Park v. Howard University*, the D.C. Circuit held that claims that are "like or reasonably related to the allegations" in the administrative complaint and "growing out of such allegations" are exhausted.

19

71 F.3d 904, 907 (D.C. Cir. 1995). But seven years after that, in *National Railroad Passenger Corp. v. Morgan*, the Supreme Court held that "[e]ach incident of discrimination . . . constitutes a separate actionable 'unlawful employment practice'" for purposes of Title VII's procedural requirements. 536 U.S. 101, 114 (2002). Since *Morgan*, "most judges in this district" have held that *Park*'s "reasonably related" rule was abrogated and that "plaintiffs alleging discrete acts of discrimination" must instead "exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others." *Wilson v. Noem*, No. 20-cv-100, 2025 WL 1000666, at *17 (D.D.C. Apr. 3, 2025) (collecting cases). The Circuit, for its part, has repeatedly reserved the question of *Park*'s vitality in the wake of *Morgan*. *See Webster v. Del Toro*, 49 F.4th 562, 568 (D.C. Cir. 2022).

This Court takes the same approach the Circuit has and leaves the question to the side for now.[6] Even under the more lenient "reasonably related" test, Pinney failed to exhaust this claim. At the time Pinney filed her first administrative complaint, she was not yet disabled. *See* ECF 56-3 ¶ 142 (first complaint filed March 2019); ECF 58-6 at 48–49 (Pinney developed shingles in September 2019 and breast cancer in November 2019). Pinney's second—and final—administrative complaint makes no mention of her having a disability, either. *See* ECF 57 at 242–43. She did check the box for "mental" disability when indicating why she believed she was discriminated against, but that only indicated discrimination on the basis of her son's schizophrenia, as she raised in her first complaint. *Id.* at 242. Pinney expressly confirmed as much in an affidavit she filed as part of the second administrative complaint, writing unequivocally that

---

[6] The Court thinks that tack particularly wise because the Rehabilitation Act's federal employment provision incorporates a different exhaustion provision than the one at issue in *Morgan*. *See* 29 U.S.C. § 794a(a)(1) (incorporating 42 U.S.C. § 2000e-16); *Morgan*, 536 U.S. at 104–05 (discussing 42 U.S.C. § 2000e-5(e)(1)). *Morgan*'s textual analysis therefore may not apply to this Rehabilitation Act claim even if it does govern exhaustion in other employment discrimination cases.

her "claim of disability discrimination is not based on any physical or mental limitation that [she] personally suffer[s]," but instead "is associational, based on [Pinney's] role as primary caregiver for [her] son." ECF 57 at 5. Because Pinney's administrative "charge contained no claims or factual allegations that could reasonably be expected upon investigation to lead to a" claim that she was discriminated against on the basis of her own disability—indeed, she expressly disavowed that claim—"she failed to exhaust her administrative remedies" for this claim and cannot press it here. *Park*, 71 F.3d at 909.

Finally, and for good measure, the Court notes that Pinney conceded this argument by failing to address it. *See Uranga v. U.S. Citizenship & Immigr. Servs.*, 490 F. Supp. 3d 86, 109 (D.D.C. 2020). NASA raised precisely this point in its motion for summary judgment. *See* ECF 55-1 at 16. In her response, Pinney responded to other of the exhaustion issues NASA raised but did not say a word about her exhaustion of this claim. *See* ECF 68-1 at 29–33. For this reason, and because Pinney did in fact fail to exhaust this claim, the Court grants summary judgment to NASA on this count of the complaint.

### C. Discrimination on the basis of age

"The federal-sector provision of the ADEA provides that '[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . shall be made free from any discrimination based on age.'" *Gomez-Perez v. Potter*, 553 U.S. 474, 479 (2008) (quoting 29 U.S.C. § 633a(a)). The familiar *McDonnell Douglas* burden-shifting framework applies to ADEA claims under this provision. *See Ford v. Mabus*, 629 F.3d 198, 201 (D.C. Cir. 2010). Because NASA has "proffer[ed] a non-[discriminatory] reason for [each of] the challenged employment action[s]" at issue here, however, "the burden-shifting framework falls away, and the central question becomes whether [Pinney] produced sufficient evidence for a reasonable jury to find that [NASA's] asserted nondiscriminatory . . . reason was not the actual reason and that

[NASA] intentionally discriminated" on the basis of age. *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015). Pinney has not cleared that bar.[7]

Pinney's case for age discrimination is predicated on a claim that her "substantially younger . . . co-workers" were not subjected to the same adverse actions she was, and on her many efforts to prove that NASA's explanations for the actions it took against her were pretextual. ECF 54 at 47–48.

Pinney's first effort—to suggest differential treatment by way of reference to her coworkers—fails because she has not identified a meaningful comparator. Pinney identifies five coworkers as benchmarks. *See* ECF 54 at 48. One of those coworkers left Pinney's division before any of the actions Pinney challenges took place and was never managed by Tezna at all. *See* ECF 67-5 at 2 (Hollowell); *see Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301–02 (D.C. Cir. 2015) (listing as a "[f]actor[] that bear[s] on whether someone is an appropriate comparator" whether that person was "disciplined by the same supervisor"). Another was hired after Tezna started as a manager, so never worked for Koren. *See* ECF 58-4 at 5 (May).

Most importantly, Pinney has failed to "demonstrate that all of the relevant aspects of [her] employment situation were nearly identical to those of the other employee[s]." *Burley*, 801 F.3d at 301. The only evidence she cites to establish the comparison are her declaration and deposition. *See* ECF 54 at 40, 47 (citing "Pinney Dep. II" and "Pinney Decl."). Pinney's "testimony is itself,"

---

[7] As with the associational discrimination claim, NASA offers several reasons this claim fails. Those include Pinney's supposed failure to exhaust many of her claims and the fact that NASA says most—although seemingly not all—of the actions Pinney complains about do not constitute "personnel actions" under the statute. 29 U.S.C. § 633a(a); *see* ECF 55-1 at 16–18, 22; *but see id.* at 26 (seemingly not arguing that AWOL citations and suspension of telework do not constitute "personnel actions"); 5 U.S.C § 2302(a)(2)(A)(xii) (defining "personnel action" in manner that might reach those actions). The exhaustion requirement is not jurisdictional, *see Koch v. Schapiro*, 699 F. Supp. 2d 3, 12 (D.D.C. 2010), and nothing in the text of 29 U.S.C. § 633a(a) suggests that the "personnel actions" element of an ADEA claim is either, *see Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 (2006) (asking if statute "speak[s] in jurisdictional terms or refer[s] in any way to the jurisdiction of the district courts"). The Court therefore does not reach those issues, and instead rests its decision on Pinney's failure to create a genuine dispute about whether NASA intentionally discriminated against her because of her age.

of course, "competent evidence." *Allen*, 795 F.3d at 41. But the problem for Pinney is that none of that testimony demonstrates that these coworkers "were charged with offenses of comparable seriousness" to the ones that led to Pinney's discipline—showing up late for a meeting at which she was scheduled to present, incorrectly entering time sheets, failing to comply with telework requirements, and doing sloppy or inadequate work on policy documents. *Burley*, 801 F.3d at 301. Instead, Pinney says only that her coworkers also took "extended lunch hours," ECF 58-2 ¶ 32, and would "start work late, or leave work early," *id.* ¶ 37. The Court, as it must, takes that testimony as true. But even granting that, Pinney has not established that she was treated worse than her younger colleagues, because the reasons given for her discipline went beyond merely taking long lunches or starting work late or leaving early.

Indeed, one of the comparators Pinney points to undermines, rather than strengthens, her age discrimination claim. Pinney cites Chandran Pillai as a coworker who was treated better than her. ECF 54 at 48. But Pillai is five years older than Pinney. *See* ECF 56-3 ¶ 150; ECF 68-2 ¶ 150. That alone defeats Pinney's attempt to show she was discriminated against based on NASA's treatment of Pillai. *See Huckstep v. Wash. Metro. Area Transit Auth.*, 216 F. Supp. 3d 69, 83 (D.D.C. 2016) ("A comparator offered to show an employer's better treatment of similarly situated employees must be *outside the plaintiff's protected group*."). And that Pillai was in Pinney's age group and had also taken FMLA leave and participated as a witness in a discrimination investigation—like Pinney—yet was not subjected to the same claimed discriminatory actions Pinney challenges here suggests that neither Koren nor Tezna were engaged in a pattern of age-based discrimination. *See* ECF 67-8 at 2–5; *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) ("A plaintiff may support an inference that the employer's . . . real reasons were prohibited

discrimination . . . by citing . . . the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff.").

As for Pinney's attempt to create a genuine dispute about age discrimination by showing NASA's proffered reasons were pretextual, that too fails. NASA has justified the actions Pinney alleges Koren took against her—issuance of the AWOL notices and counseling letter, the low interim performance score, revoking telework privileges, and the leave requirements, *see* ECF 16 ¶ 161; ECF 54 at 47; *id.* at 32—on the basis of Pinney's "repeated failures to follow leave instructions" and "deficiencies in [Pinney's] work performance," ECF 55-1 at 26–27, 29. It is undisputed that Pinney had a history of attendance issues dating to the missed meeting in 2017 and had been cited in 2017 by Koren for failing to comply with telework requirements. *See* ECF 56-3 ¶ 22; ECF 68-2 ¶ 22; ECF 68-3 at 31. So too is it undisputed that Koren communicated requirements for taking leave to Pinney in 2018. *See* ECF 57 at 106; *see also* ECF 56-3 ¶ 42; ECF 68-2 ¶ 42. Pinney says those requirements were themselves discriminatory, and for evidence points to the fact that NASA's human resources department leaves it to the manager to decide how leave will be requested and approved. *See* ECF 58-9 at 4. But it was evidently Koren's belief, based on Pinney's history of leave and telework related issues, that Pinney needed somewhat stringent tracking requirements to ensure leave was properly used. Because that belief was "reasonable in light of the evidence" and Pinney has not put forward evidence that creates a doubt about whether it was "honestly held," there is no reason to "put the case to a jury" based on Koren's imposition of leave requirements. *Allen*, 795 F.3d at 41. Nor is there any reason to doubt that the actions Koren took against Pinney based on Pinney's failure to follow those requirements—submitting doctors' notes late, for instance, *see* ECF 68-2 at 25—were sincerely based on that failure.

Same for Koren's feedback to Pinney in the interim performance review that led to revocation of her telework privileges. *See* ECF 57 at 141. Pinney tries to poke holes in that feedback. For example, she says that she was unfairly maligned for failing to provide any "analysis or review" of a piece of legislation she was asked to provide "review comments" on. *Id.* at 137. That request, according to Pinney, did not call for "analysis"—only "comments"—so she was unfairly "failed . . . for not completing a project she had never been assigned." ECF 71 at 19. Pinney's interpretation of the assignment—that a request for "comments" called only for the "brief summary" she delivered, ECF 57 at 137—strikes the Court as borderline implausible, *Goodrich v. Bank of Am. N.A.*, 136 F.4th 347, 353 (D.C. Cir. 2025) (courts must draw "all *reasonable* inferences" in non-movant's favor on summary judgment (emphasis added)). But even granting that Pinney reasonably understood the assignment as she says she did, she has failed to create a genuine dispute about whether Koren "honestly and reasonably believed" the assignment to require far more than what Pinney did, and therefore "honestly and reasonably" docked Pinney for her performance on that assignment. *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005).

The story is similar for Tezna. There is some evidence in the record that raises questions about why Tezna imposed the performance improvement plan when there were perhaps less drastic ways to address his concerns about Pinney's work performance: Tezna's supervisor at the time the performance plan was imposed—Kevin Buford—"disagree[d]" with Tezna's decision to impose the performance plan. ECF 58-5 at 7. Buford's view, having reviewed the issues Tezna identified with Pinney's revision of the policy document, was that the problems were "relatively minor" and should have been easily cleared up by Tezna "engaging with [Pinney], even just sitting down for a couple hours." *Id.* at 7. That internal disagreement among Pinney's management chain, however, is not sufficient to create a genuine dispute about the ultimate question of whether the imposition

of the performance plan and later issuance of the notice of proposed removal were "[]tainted by any consideration of age." *Babb v. Wilkie*, 589 U.S. 399, 402 (2020).

The reason why is three-fold. First, Pinney has not created a dispute about the sincerity of Tezna's belief that Pinney's revisions of the policy document were inadequate. Even on Buford's telling, Tezna was "disappoint[ed]" with Pinney's work on that assignment. ECF 58-5 at 6. That Tezna "honestly" believed Pinney had performed poorly on the revision, *Allen*, 795 F.3d at 41, undermines Pinney's argument that the actions he later took against Pinney based on that assignment were actually based on any consideration of age. Second, it is undisputed that Pinney and Tezna worked well together until she turned in the policy revision at the end of July 2019. *See* ECF 56-3 ¶ 92; ECF 68-2 ¶ 92. But Pinney was above the age of 40, so in the protected class, throughout that period. ECF 54 at 7 (Pinney was born in 1953). As it was with the associational discrimination claim, that Tezna seemingly had no issue with Pinney—despite her age—until the problem with the policy document arose undermines the age discrimination claim, too. *See Vatel*, 627 F.3d at 1247. Finally, it is undisputed that after Tezna "removed" Pinney's responsibility for revising the policy document, the task was reassigned to a group of employees that included someone who was older than Pinney. ECF 54 at 29 ¶ 115 (listing Chandran Pillai); ECF 67-1 ¶ 115; ECF 56-3 ¶ 150 (discussing Pillai's age); ECF 68-2 ¶ 150. That an older employee was tasked with finishing the assignment suggests Tezna's concerns had nothing to do with Pinney's age and everything to do with Pinney's performance on the assignment. For all of these reasons, Pinney has not created a genuine dispute as to her age discrimination claim, so the Court grants judgment to NASA on that claim.

### D. Retaliation

Both the ADEA and Rehabilitation Act protect federal-sector employees from retaliation. *See Gomez-Perez*, 553 U.S. at 491 (ADEA); 29 U.S.C. § 791(f) (Rehabilitation Act incorporating ADA's retaliation provision at 42 U.S.C. § 12203). "To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). As with the discrimination claims, the *McDonnell Douglas* framework applies but, because NASA has proffered non-retaliatory justifications for its actions, the "framework falls away" and the "central question" is whether a reasonable jury could find that the "non-retaliatory reason was not the actual reason" and NASA "retaliated against" Pinney. *Allen*, 795 F.3d at 39. Because Pinney has not put forward evidence from which a reasonable jury could draw that conclusion about her treatment by either Koren or Tezna, NASA is entitled to summary judgment on this claim, as well.

Beginning with Koren, as it was with the associational discrimination claim, the timeline belies Pinney's claim. Koren's issues with Pinney's attendance began in February 2017. *See* ECF 56-3 ¶ 22; ECF 68-2 ¶ 22. At the earliest, Pinney's protected activity began after that, when Pinney "provided evidence" in support of another employee's discrimination complaint against Koren. ECF 58-2 ¶ 21. That Koren's issues with Pinney's attendance predate any protected activity cuts strongly against the suggestion that the later actions she took based on those issues were retaliatory. *See Doe v. Columbia*, 151 F.4th 435, 450 (D.C. Cir. 2025) (concluding no reasonable jury could find for plaintiff where defendant's allegedly retaliatory conduct "began before" defendant "became aware" of protected activity).

27

Pinney tries to resist this conclusion in two ways, neither of which holds up to scrutiny. First, Pinney's counsel baldly asserts in her response to NASA's statement of undisputed facts that Pinney provided evidence in this investigation on February 10, 2017—before Pinney missed the meeting—and that this "is documented." ECF 68-2 at 7. But none of the materials Pinney cites in support of that statement include that date. *See* ECF 68-2 at 8 (citing the Currier Declaration filed at ECF 68-6 at 2–9, and ECF 58-6 at 36). In a footnote, Pinney offers what looks like a quote from an "intake" for Currier's complaint, ECF 68-2 at 8 n.4, but does not point the Court to that document anywhere in the record. The local rules require "references to the parts of the record relied on to support the statement," LCvR. 7(h)(1), and although the Court did look—in vain—to see if this date was established somewhere in the record, it was under no obligation to do so, *see Est. of Parsons v. Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011) ("[J]udges are not like pigs, hunting for truffles buried in briefs or the record.") (Tatel, J., concurring). Second, Pinney confusingly "objects generally to the 2017 timeframe . . . as it is outside the relevant time frame" in her complaint. ECF 68-2 at 6 n.3. That assertion is confusing because Pinney included in her complaint allegations about the 2017 investigation that she provided evidence for, *see* ECF 16 ¶¶ 21–24, and relies on that protected activity as a basis for her retaliation claim throughout her summary judgment briefing, *see, e.g.*, ECF 54 at 39. Regardless, this argument is unfounded: Pinney's conduct in 2017 is surely relevant evidence for NASA in establishing its proffered reason for taking actions against Pinney, and Pinney has offered no reason to think NASA could not admit this evidence at trial. *See* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 401.

What's more, the sequence of events in 2017 is not the only thing that undermines Pinney's retaliation claim as it relates to Koren. There are similar problems when it comes to the AWOL citations in 2018. The first of those citations was issued on August 3, 2018. ECF 56-3 ¶ 45;

ECF 68-2 ¶ 45. True, that was after Pinney filed a complaint about Koren in November 2017. *See* ECF 58-2 ¶ 23. But that complaint was filed almost ten months before the first AWOL citation. And even if measuring from the moment the investigation of that complaint wrapped up, there was a four-month gap between the protected activity and first citation. *See id.* ¶ 24. "[A]n inference of retaliatory motive based upon the mere proximity in time between [Pinney's complaint] and the [first] AWOL listing" is therefore "untenable on the record here." *Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (holding same where AWOL was issued "two and one-half months" after plaintiff's protected activity). And—for the reasons already discussed in relation to the ADEA claim—Pinney has not created a genuine dispute about whether Koren's rationales for the various actions taken against Pinney were pretextual. *See supra* 24–25. Given that neither temporal proximity nor the possibility of pretext suggests Koren retaliated against Pinney, there is no genuine dispute as to this aspect of Pinney's retaliation claims.

The same is true of Pinney's allegation that Tezna retaliated against her after she filed this lawsuit in July 2019. Recall that, after a rocky start to their relationship, things went well between Tezna and Pinney in the first half of 2019. *See* ECF 56-3 ¶ 92; ECF 68-2 ¶ 92. Tezna told Pinney that he was "pleased with the work [she had] been doing," reinstated her telework privileges, and rated her as fully successful in her annual review. ECF 57 at 153; ECF 60-1 at 1. But things began to change on August 16, 2019. That is the day Tezna first "notified [Pinney that] he was not satisfied with" the work she had done revising a policy document. ECF 57 at 9. Around two months after that, on October 15, Tezna sent Pinney the letter of warning notifying Pinney that her "performance" on the policy document "was at unacceptable levels." *Id.* at 11. About two weeks later, Tezna issued the performance improvement plan, and six weeks after that, the notice of proposed removal. *See* ECF 58-2 ¶¶ 90, 107. NASA, of course, says all of this was done because

Pinney's work really was deficient. *See* ECF 67 at 27–28. Pinney, however, says that all of this was retaliation in response to her "commencement of this lawsuit." ECF 54 at 43.

The problem with Pinney's argument is that she has not identified facts from which a reasonable jury could conclude that Tezna was aware Pinney filed this lawsuit at the time he took the allegedly retaliatory actions. Pinney filed this lawsuit on July 29, 2019. *See* ECF 1. The complaint was not served until late September. *See* ECF 67 at 27 (identifying this date based on a previous motion for an extension). Tezna first told Pinney he was "not satisfied with" the work she had done on the policy document on August 16. ECF 57 at 9. In other words, Tezna's issues with Pinney's performance on the policy document—issues which became the basis for the performance improvement plan and later notice of removal, *see* ECF 57 at 168—"began before" Pinney even served the complaint on NASA. *Doe*, 151 F.4th at 450. Pinney has identified no evidence in the record—despite NASA squarely making this argument, *see* ECF 67 at 27—from which a reasonable jury could conclude Tezna was aware, before Pinney even effectuated service, of her filing this lawsuit. *See* ECF 54 at 43–44 (discussing only the fact that the lawsuit was filed); ECF 71 at 22–24 (relevant section of Pinney's reply brief failing to respond to argument that Tezna lacked notice of the lawsuit).

Because every allegedly retaliatory action Tezna took against Pinney flows from his complaints about Pinney's revisions of the policy document, and because those complaints began before Pinney even served NASA, this case closely resembles *Clark County School District v. Breeden*, 532 U.S. 268 (2001). There, the employee's supervisor said he was "contemplating" taking the putatively retaliatory action against the employee the day before the "summons and complaint" were served. 532 U.S. at 272. Given that sequence, the Court—in a case that came to

it from a grant of summary judgment to the employer—held that no reasonable jury could find that the employee had been retaliated against. *See id.* The same is true here.

And even granting the possibility that Tezna had not yet decided to issue the performance improvement plan before the end of September—when the complaint was served—Pinney has still failed to identify any fact from which the jury could conclude that Tezna was aware of this case when he later issued the performance plan. Tezna was not personally named as a defendant, *see* ECF 1 at 1, and Pinney has not put forward an iota of evidence that suggests the NASA administrator who was sued, the Department of Justice lawyers who entered an appearance in the case, or anyone else in the federal government notified Tezna about the litigation before he issued the performance plan on November 1, 2019, *see* ECF 58-2 ¶ 90. In an organization as large and complex as NASA (and layer on top of that the Department of Justice) it is not reasonable to infer just from the mere fact that the complaint has been served and a lawyer has entered an appearance that an individual employee involved in the underlying dispute would quickly learn of the lawsuit. To be sure, there may be cases in which a supervisor's abrupt change in behavior shortly after service of a complaint could give rise to an inference that the supervisor was aware of the lawsuit. But here, where the supervisor's concerns predate service of the complaint and it was those same concerns that were acted on after service, the supervisor's actions themselves do not give rise to an inference that the supervisor was aware of the case's filing. *See Breeden*, 532 U.S. at 272 ("[P]roceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). The filing of the complaint and the lawyer's entry of an appearance are, then, the only facts from which Pinney draws the inference that Tezna was aware

of this lawsuit. *See* ECF 54 at 44. On this record, no reasonable jury could find that Tezna took his allegedly retaliatory actions because Pinney filed this case.[8]

Pinney's discussion of an affidavit in which Tezna's supervisor said he was aware of Pinney having filed EEO complaints does not change that conclusion. *See* ECF 60-19 at 3–4. For one, Pinney filed EEO complaints in March 2019 and March 2020. *See* ECF 56-3 ¶¶ 142, 154; ECF 68-2 ¶¶ 142, 154. Pinney has offered no reason to think Tezna's supervisor was referring in that affidavit to this lawsuit, rather than the actual EEO complaints Pinney filed. Those EEO complaints, however, are far too temporally removed from Tezna's allegedly retaliatory actions— which took place in late 2019—to suggest that Tezna's supervisor's awareness of them somehow contributed to the actions Tezna took. *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) ("[O]nly where the two events are very close in time does temporal proximity support an inference of causation."). For another, Pinney has not identified any evidence to suggest that it was Tezna's supervisor, rather than Tezna, who decided to issue the performance improvement plan and eventual notice of removal. Tezna's supervisor acknowledged that he advised Tezna on how he should go about taking those actions, but his undisputed testimony is that the performance plan was "proposed" by Tezna, and it was that plan that led to the notice of proposed removal. ECF 60-19 at 4–5. That there is no evidence from which a reasonable jury could conclude Tezna was aware of Pinney having filed this lawsuit at the time he made those decisions is fatal to this retaliation claim.

### E. Constructive discharge

Pinney's final claim is that, although she retired, she only did so because NASA "created intolerable working conditions that forced her to retire." ECF 54 at 48. Because no reasonable jury

---

[8] To the extent Pinney tries to bring a retaliation claim based on Tezna reassigning her to a new cubicle, *see* ECF 68-1 at 19, that claim fails for the same reason. That relocation also took place in early November 2019. *See id.*

could conclude that Pinney was "discriminated" or "retaliate[ed]" against, this claim necessarily fails, too. *Green v. Brennan*, 578 U.S. 547, 555 (2016) (describing one of the "two basic elements" of a constructive discharge claim as proof that plaintiff was "discriminated against"); *Richardson v. Petasis*, 160 F. Supp. 3d 88, 137 (D.D.C. 2015) (explaining that "retaliation can be the basis for a constructive discharge claim").

*   *   *

Pinney's motion for summary judgment, ECF 54, is **DENIED**, and NASA's motion for summary judgment, ECF 55, is **GRANTED**. The Court will issue a separate order consistent with this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: March 5, 2026